MARCHIE TIGER *v.* WESTERN INVESTMENT COMPANY.

ERROR TO THE SUPREME COURT OF THE STATE OF OKLAHOMA.

No. 60.    Argued November 30, December 1, 2, 1910; restored to docket for reargument January 23, 1911; reargued March 1, 2, 1911.—Decided May 15, 1911.

The obvious purpose of § 8 of the act of May 27, 1908, c. 199, 35 Stat. 312, was to continue supervision over the right of full-blood Indians to dispose of lands by will, and to require conveyances of interests of full-blood Indians in inherited lands to be approved by a competent court.

When several acts of Congress are passed touching the same subject-matter, subsequent legislation may be considered to assist in interpretation of the prior legislation.

In passing the enabling act for the admission of Oklahoma of June 16, 1906, c. 3335, 34 Stat. 267, Congress preserved the authority of the Government of the United States over the Indians, their lands and property, which it had prior to the passage of that act.

The act of April 26, 1906, c. 1876, 34 Stat. 137, providing for the final disposition of the affairs of the Five Civilized Tribes in Indian Territory, while it permitted lands to be conveyed by full-blood Indians, was nevertheless intended to prevent imprudent sales by this class of Indians and made such conveyances valid only when affirmed by the Secretary of the Interior.

*Quære* whether the constitutionality of an act of Congress limiting a right of conveyance by a class of Indians can be questioned by the

grantee of an Indian of that class on the ground that it deprives the Indian of his property without due process of law.

From the earliest period Congress has dealt with Indians as dependent people and legislated concerning their property with a view to their protection as such.

Congress has full power to legislate concerning tribal property of Indians, and the conferring of citizenship on individual Indians does not prevent Congress from continuing to deal with tribal lands.

It is for Congress, in pursuance of long established policy of this Government, and not for the courts, to determine for itself when, in the interest of the Indian, government guardianship over him shall cease.

The privileges and immunities of Federal citizenship do not prevent such proper governmental restraint upon the conduct or property of citizens as may be necessary for the general good.

When the act of April 26, 1906, was passed, Congress had not by the supplemental Creek agreement of June 30, 1902, c. 1323, 32 Stat. 500, or by any other act, released its control over the alienation of lands of full-blood Creek Indians, and it was within its power to continue to restrict such alienation, notwithstanding the bestowal of citizenship upon the Indians, by requiring the approval of the Secretary of the Interior to conveyances made by them.

As above construed, the act of April 26, 1906, c. 1876, 34 Stat. 137, is not unconstitutional as depriving full-blood Indians upon whom citizenship has been bestowed of their property without due process of law because it places further restrictions upon their right of alienation of lands.

21 Oklahoma, 630, reversed.

THE facts, which involve the construction and constitutionality of the provision of the act of April 26, 1906, c. 1876, 34 Stat. 137, requiring certain conveyances of full-blood Indians to be approved by the Secretary of the Interior, are stated in the opinion.

*Mr. W. L. Sturdevant,* with whom *Mr. M. L. Mott* and *Mr. W. A. Brigham* were on the brief, for plaintiff in error:

In determining the meaning and application of a statute, the courts will consider the mischief to be prohibited

or the benefits to be conferred, the nature of the subject-matter, the class and condition of the persons to be affected, the necessities and circumstances of its enactment, the system of laws of which it is a part, its necessary relation to, and effect upon, that system, its consistency with other provisions of the same and also prior and subsequent acts, the general policy of legislation upon the same subject and the consequences to result from the construction adopted.

When the purpose and scope of a statute are thus ascertained its language becomes subservient thereto to the extent that what is within the intention of the lawmaker is within the statute whether within its terms or not, and that what is not within such intention is not within the statute although included within its terms.

From the inception of the legislation providing for allotment of these lands to the last act upon the subject no affirmative expression by Congress can be found removing restrictions or governmental control from inherited lands of full-blood Indians.

The authority of the Government, so often asserted and so long exercised over a subject so peculiarly within the province and necessity of that authority, will not be abandoned by such an omission when, upon all positive declaration, the intention has been otherwise.

Sections 19 and 22 of the act of April 26, 1906, when read in connection with § 23 of that act and §§ 8 and 9 of the act of May 27, 1908, show an unmistakable intention on the part of Congress to protect and, in furtherance of that end, to extend the period of restrictions upon the inherited lands of full-blood Indians. Section 7, act of March 1, 1901, 31 Stat. 861; §§ 6, 16, act of June 30, 1902, 32 Stat. 500; §§ 19, 22, 23, 28, 29, act of April 26, 1906, 34 Stat. 137; §§ 8, 9, act of May 27, 1908, 35 Stat. 312; Endlich on the Interp. Stat., §§ 43, 45, 103, 258, 265, 295, 320, 322; Lewis's Sutherland on Stat. Const., 2d ed., §§ 443, 447,

448, 585, 586, 590, 592; Black on Interpretation, § 113; *Alexander* v. *Mayor*, 5 Cranch, 7; *United States* v. *Freeman*, 3 How. 556; *Brewer* v. *Blougher*, 14 Pet. 178; *Brown* v. *Douchesne*, 19 How. 183; *Lamp Chimney Co.* v. *Brass & Copper Co.*, 91 U. S. 656; *Kohlsaat* v. *Murphy*, 96 U. S. 153; *McKee* v. *United States*, 164 U. S. 287; *Interstate Drainage Co.* v. *Comes*, 158 Fed. Rep. 273; *Goodrum* v. *Buffalo*, 162 Fed. Rep. 817; *Keeney* v. *McVoy*, 206 Missouri, 42; *Hill* v. *American Surety Co.*, 200 U. S. 203; *Johnson* v. *Southern Pacific Co.*, 196 U. S. 1; *United States* v. *Moore*, 161 Fed. Rep. 518, 519; *United States* v. *Hanson*, 167 Fed. Rep. 893; 26 Op. Atty. Gen. 352.

On the definition and construction of provisos, see Black on Int., § 110; *Georgia Bkg. Co.* v. *Smith*, 128 U. S. 174; *Chesapeake Co.* v. *Manning*, 186 U. S. 239; *United States* v. *Whitridge*, 197 U. S. 135; *United States* v. *Scruggs &c. B.*, 156 Fed. Rep. 940.

The General Government has power to deal with, control and protect the property of the Indians, where not expressly abandoned. Arising originally out of the necessities of the situation, it now has the support of immemorial legislative and executive usage, and of judicial sanction.

This power must, in the nature of things, continue until its further exercise is deemed unnecessary by those in whom it rests. *United States* v. *Rickert*, 188 U. S. 439; *Cherokee Nation* v. *Hitchcock*, 187 U. S. 249; *Lone Wolf* v. *Hitchcock*, 187 U. S. 553; *Stephens* v. *Cherokee Nation*, 174 U. S. 484; *United States* v. *Kagama*, 118 U. S. 375; *Worcester* v. *Georgia*, 6 Pet. 515; *Wallace* v. *Adams*, 204 U. S. 420.

When the agreements were entered into between the Government and the Creek tribe of Indians providing for the allotment of their lands, and laws were enacted to carry them into effect, the authority of the Government over these lands, exercised prior thereto, was not wholly

abandoned or intended by either party to the agreements so to be abandoned. But, on the contrary, further restrictions were imposed upon the alienation of the allotments for a given period.

By reason of this reservation of authority, the jurisdiction or power of Congress was continued and maintained over the subject; and this power, limited though it may be, can be exercised whenever in the judgment of Congress its exercise is necessary to protect the subject, that is, the property of the Indian, and to maintain, likewise, the policy of the Government. The restriction is an agency through which a governmental power may be exercised.

The breaking up of tribal interests in the lands and their allotment in severalty ushered in a new policy in dealing with the Indian. This new policy sought to localize and individualize the Indian. And the Government undertook to protect him in an individual property right as it had previously done in a tribal property right.

Congress, having retained authority over the subject by agreement and, acting within the life of the agreement and while the tribal government still exists, may conclude that a longer period of care and supervision is necessary to its policy and in the best interests of both the Goverment and the Indian and, thereupon, extend the period of restrictions by appropriate legislation. This, of course, comes within the rightful exercise of power reserved over the subject and the act in controversy and all its provisions are, therefore, valid.

This relation of the Government and the Indian is not affected by his citizenship, or by any other rights which he may possess, or by the police power of the State over him, or by any rights which the State of Oklahoma has in the premises; but, on the contrary, it is entirely compatible with all these. *Smith* v. *Stevens*, 10 Wall. 321; *Wiggan* v. *Connolly*, 163 U. S. 60; *In re Heff*, 197 U. S. 488;

*Goodrum* v. *Buffalo*, 162 Fed. Rep. 817; *United States* v. *Rickert*, 188 U. S. 432; *United States* v. *Hall*, 171 Fed. Rep. 218; *Rainbow* v. *Young*, 161 Fed. Rep. 836; *National Bank of Commerce* v. *Anderson*, 147 Fed. Rep. 87; *United States* v. *Thurston County*, 143 Fed. Rep. 287; *Lone Wolf* v. *Hitchcock*, 187 U. S. 553; *McKay* v. *Kalyton*, 204 U. S. 458; *Conley* v. *Ballinger*, 216 U. S. 84; §§ 1, 3 (cl. 3), 22, Enabling Act; 34 Stat. 267; § 497, Constitution Oklahoma.

Powers, rights and interests of sovereignty are never relinquished by lapse or implication. Once established and asserted, they are presumed to exist and to continue to exist until abandoned by express terms. This principle applies, alike, to prerogatives of the executive, powers of the legislature and the jurisdiction of courts. All acts derogatory thereof are strictly construed and every doubt resolved in favor of their perpetuity. *United States* v. *Herron*, 20 Wall. 251; *National Bank* v. *Anderson*, 147 Fed. Rep. 90; *Hamilton* v. *Reynolds*, 88 Indiana, 193; *State* v. *Polacheck*, 101 Wisconsin, 430; *Pooler* v. *United States*, 127 Fed. Rep. 519; *United States* v. *Knight*, 14 Pet. 301; *Wheeling & B. Bridge Co.* v. *Wheeling Bridge Co.*, 138 U. S. 287; *United States* v. *Shaw*, 39 Fed. Rep. 39; *Mosle* v. *Bidwell*, 130 Fed. Rep. 335.

*Mr. George S. Ramsey* and *Mr. S. T. Bledsoe*, with whom *Mr. C. L. Thomas*, *Mr. L. J. Roach*, *Mr. Chris. M. Bradley* and *Mr. R. C. Allen* were on the brief, for defendants in error:

The act of Congress, approved April 26, 1906, did not in the Creek Nation operate to extend beyond August 8, 1907, restrictions against alienation by full-blood Indians of lands inherited by them.

The restrictions against the alienation by the allottee are personal to the allottee and do not run with the land. The restrictions against the alienation by the heirs are personal to the heirs and do not pass with the land to a

vendee of the heirs. *Oliver* v. *Forbes,* 17 Kansas, 128; *Clark* v. *Lord,* 20 Kansas, 393, 396; *McMahon* v. *Welch,* 11 Kansas, 290.

The restrictions against alienation imposed by § 7 of the Original Agreement, and § 16 of the Supplemental Agreement were personal to the allottee and his heirs. *Libby* v. *Clark,* 118 U. S. 250; *United States* v. *Payne Lumber Co.,* 206 U: S. 467.

The only restrictions on heirs expired five years from the date of the approval of the Supplemental Agreement, which was on August 8, 1907. The last sentence in § 22 does not extend the restrictions against alienation by heirs who are full-bloods, but simply left such full-bloods under the restrictions already existing, which expired five years from the date of the ratification of the Supplemental Agreement. This last sentence is a proviso or exception. A proviso is a clause added to a statute, or to a section or part thereof, which introduces a condition or limitation upon the operation of the enactment, or makes special provision for cases excepted from the general provisions of the law, or qualifies or restrains its generality, or excludes some possible ground of misinterpretation of its extent. Black on Interpretation of Laws, 270, 273; 2 Sutherland on Stat. Const., § 352; *United States* v. *Dickson,* 15 Pet. 141, 165.

A proviso should be construed strictly and takes no case out of the enacting clause which does not clearly fall within its terms. *Ryan* v. *Carter,* 93 U. S. 78, 85; *United States* v. *Alston, Newhall & Co.,* 91 Fed. Rep. 529; *Carter* v. *Hobbs,* 92 Fed. Rep. 599; *Wall* v. *Cox,* 101 Fed. Rep. 409; *In re Matthews,* 109 Fed. Rep. 614; *Boston Safe Deposit Co.* v. *Hudson,* 68 Fed. Rep. 760; *United States* v. *Schilerholz,* 137 Fed. Rep. 618; *Gould* v. *New York Life Ins. Co.,* 132 Fed. Rep. 929; *Murray* v. *Beal,* 97 Fed. Rep. 569; *Paxton Lumber Co.* v. *Farmers' Lumber Co.,* 50 Am. St. Rep. 596.

A proviso should be strictly construed and must be construed with reference to the subject-matter of the section of which it forms a part, unless there is a manifest legislative intention that it should limit the operation of other sections of the act. *United States* v. *132 Packages of Spirituous Liquors*, 65 Fed. Rep. 983; *Chattanooga R. & C. R. Co.* v. *Evans*, 66 Fed. Rep. 814; *In re Matthews*, 109 Fed. Rep. 614; *McRae* v. *Holcomb*, 46 Arkansas, 306; *Bragg* v. *Clark*, 50 Alabama, 363.

The act of Congress approved April 26, 1906, in so far as it undertook to place additional restrictions on the alienation of allotted lands to which the allottee held a patent is unconstitutional and void.

On August 8 and 13, 1907, Marchie Tiger had full power to convey, without supervision or restriction of any kind whatever, the lands inherited by him from his deceased ancestors, and his warranty deeds of those dates to the defendants in error were valid conveyances of his inherited lands, because Marchie Tiger and Marchie Tiger's ancestors were citizens of the United States. Act of March 3, 1901, 24 Stat. 390; *Ross* v. *Ellis*, 56 Fed. Rep. 855; *United States* v. *Hall*, 171 Fed. Rep. 214; *United States* v. *Boss*, 160 Fed. Rep. 132; *Dick* v. *United States*, 208 U. S. 352; Rep. Senate Select Committee, Vol. 1, p. v. (1906); *In re Heff*, 197 U. S. 488; *Ex parte Savage*, 158 Fed. Rep. 205; *United States* v. *Saunders*, 96 Fed. Rep. 268; *United States* v. *Kopp*, 110 Fed. Rep. 160; *Ex parte Viles*, 139 Fed. Rep. 68; *United States* v. *Dooby*, 151 Fed. Rep. 697; *United States* v. *Augur*, 153 Fed. Rep. 671; *United States* v. *Allen et al.*, 171 Fed. Rep. 907.

Marchie Tiger's ancestors owned these lands in fee simple absolute, subject only to the condition or limitation, contained in the grant, that the lands should not be alienated by them or their heirs before the expiration of five years from August 8, 1902. *Taylor* v. *Brown*, 147 U. S. 640: Report of Senate Select Committee, Vol. 1,

p. v (1906); Act of March 1, 1901, 31 Stat. 861, § 7; Act of June 30, 1902, 32 Stat. 500, §§ 6, 16.

It is not within the power of Congress to create a condition or limitation, or extend a condition or limitation affecting these lands, after conveyance to the allottees and the acceptance of the conveyance by the allottees, in fee simple, subject only to the definite condition or limitation expressed in the grant. *Jones* v. *Meehan*, 175 U. S. 1; *In re Heff*, 197 U. S. 488; Report of Select Senate Committee, Vol. 1, p. v (1906).

All other cases adjudicated by this court, bearing upon titles to Indian lands and rights therein, are to be distinguished from the case at bar, for the reason that the status of full citizenship and full ownership of property does not occur in any case heretofore presented. *United States* v. *Rickert*, 188 U. S. 433; *Cherokee Nation* v. *Hitchcock*, 187 U. S. 294; *Lone Wolf* v. *Hitchcock*, 187 U. S. 553; *Choctaw Nation* v. *United States*, 119 U. S. 1; *Stephens* v. *Cherokee Nation*, 174 U. S. 445; *Taylor* v. *Brown*, 147 U. S. 640; *Ex parte Savage*, 158 Fed. Rep. 205; *Wiggan* v. *Connolly*, 163 U. S. 56.

*Mr. Wade H. Ellis* for the United States, by leave of the court:

The United States asks to be heard for the reason that the interests of all Indians of the Five Civilized Tribes, whose welfare the Government is bound to guard, are here involved.

The questions involved in the present case are, Did the act of April 26, 1906, forbid the alienation of inherited lands by full-blood Creek Indians without the approval of the Secretary of the Interior, subsequent to August 8, 1907? and, If the act did forbid such alienation was it constitutional?

The act of April 26, 1906, constitutes a comprehensive and uniform system regulating the alienation of lands by

full-blooa Indians of all the Five Tribes and completely supersedes the previous distinctions between Indians of the same degree of blood but members of different tribes.

The statutes *in pari materia* show that § 22 of the act of April 26, 1906, is intended to forbid conveyances by Indian heirs who are full-bloods except with the approval of the Secretary of the Interior.

The history of legislation respecting Indian lands; the special agreements with various tribes and the uniform policy of the Government, make a strong presumption against the claim that Congress intended to permit the alienation of lands by full-blood Indians free from all restraint.

Defendants in error rely on the fact that the Creek Indians were, by an act of March 3, 1901, made citizens of the United States, and that after that date Congress had no power to restrict the alienation of their lands. The plenary power of the United States over the Indian and his land rests upon considerations that are not affected by the grant of citizenship. Const., Art. I, § 8; Art. IV, § 3, provides that Congress shall have power to dispose of and make all needful rules and regulations respecting the territory. There is a moral obligation on the part of a superior and civilized nation to protect a dependent and uncivilized race over whose former domain it has assumed control.

Unallotted tribal Indian lands are always within the control of Congress. *Cherokee Nation* v. *Hitchcock*, 187 U. S. 294; *Lone Wolf* v. *Hitchcock*, 187 U. S. 553; *Stephens* v. *Cherokee Nation*, 174 U. S. 445; *Conley* v. *Ballinger*, 216 U. S. 84.

Even lands allotted to Indians in severalty may be continued under the direct supervision of Congress. *United States* v. *Rickert*, 188 U. S. 432.

Congress may continue, or impose anew, restrictions upon the alienation of allotted Indian lands, even after

the limitations reserved in the original grant have expired. *Stevens* v. *Smith*, 10 Wall. 334; *Jones* v. *Meehan*, 175 U. S. 1.

There is nothing in the grant of citizenship which shows any purposè on the part of Congress to surrender its power to legislate for the Creek Indians and to supervise the disposition of their lands.

The *Heff Case*, 197 U. S. 488, does not sustain defendants in error. In the present case the citizenship granted is Federal only and the Indians are not made subject to local laws with respect to their lands.

The *Celestine Case*, 215 U. S. 278; *Sutton Case*, 215 U. S. 291; *United States* v. *Rickert*, 198 U. S. 432, hold that the grant of citizenship does not deprive Congress of its full power to legislate with respect both to the Indian and his lands unless they have been expressly subjected by Congress to state control; that the intention of Congress to withdraw Federal control over the Indian and his lands must be clearly expressed, and the courts will not assume it. This is explicitly stated in the *Heff Case;* that there is a difference between political rights and property rights in so far as either may be affected by the grant of citizenship and property rights may be controlled by Congress even though political rights are granted.

In the case at bar there can be no conflict between national and state authority for the further reason that the act of April 26, 1906, was passed, and the attempted conveyance in violation of its terms took place before Oklahoma became a State. And see act of June 16, 1906, 34 Stat. c. 3335.

The United States has the right to continue its guardianship over Indians who have been made citizens of the United States. *Wiggan* v. *Connolly*, 163 U. S. 56; *United States* v. *Allen*, 179 Fed. Rep. 13; *United States* v. *Flournoy &c. Co.*, 69 Fed. Rep. 891; *Hitchcock* v. *Bigboy*, 22 App. D. C. 275; *Ross* v. *Eells*, 56 Fed. Rep. 855.

Without regard to citizenship Congress had full power to impose restrictions upon the alienation of land by full-blood Indians, as a class of incompetents. *Rice* v. *Parkman,* 16 Massachusetts, 326; *Mormon Church* v. *United States,* 136 U. S. 1; *Shively* v. *Bowlby,* 152 U. S. 1; *Muller* v. *Oregon,* 208 U. S. 412.

Minors and lunatics may be citizens and yet their property rights may be restricted. That full-blood Indians of the Five Tribes are, as a class, incompetent, must be assumed not only from the legislation of Congress with respect to them but from the findings of the Court of Claims where, in the case of *Brown and Gritts* v. *United States,* 44 C. Cl. 283, it was expressly found that full-blood Cherokees whose right to alienate their lands was forbidden by legislation contemporaneous with that involved in the case at bar, were, as a class, unable to speak the English language and incompetent to guard their interests from designing persons who were constantly attempting to induce them to part with their property at grossly inadequate compensation.

There are now pending many suits brought by the United States to cancel conveyances made in violation of the act of April 26, 1906, and more than 25,000 transactions of this character await the determination of the present case, and of several other cases involving substantially the same questions, which have already reached this court. Both the Government of the United States and the national councils of the several tribes desire to protect these full-blood Indians from their own incompetence. They assume this to be an obligation not alone to the Indian himself, but one arising out of grave consideration of the public welfare, for if the Indians are despoiled of their lands or part with them for an inadequate compensation the hope that they may develop into self-supporting and independent members of the communities in which they live will be destroyed, and they

will become vagrants and wanderers, dependent upon the bounty of the United States or of the States in which they reside and threatening to the good order of society.

*Mr. S. T. Bledsoe* and *Mr. Evans Browne,* as *amici curiæ,* by leave of the court filed suggestions in support of the contentions of defendants in error.

MR. JUSTICE DAY delivered the opinion of the court.

This case involves the validity of conveyances made by Marchie Tiger, plaintiff in error, a full-blood Indian of the Creek tribe, to the defendants in error, the Western Investment Company, and Ellis H. Hammett, R. C. Allan and J. C. Pinson, copartners under the name of Coweta Realty Company

The lands in controversy were located in the Indian Territory, were allotted under certain acts of Congress, to which we shall have occasion to refer later, and were inherited by Marchie Tiger during the year 1903 from his deceased brother and sisters, Sam, Martha, Lydia and Louisa Tiger, also members of the Creek nation, and allottees of the lands which passed by inheritance to Marchie Tiger.

According to the law of descent and distribution, which had been put in force in the Indian Territory, Marchie Tiger was the sole heir at law of his deceased brother and sisters. 32 Stat. 500, June 30, 1902, c. 1323; Mansfield's Dig. Arkansas Stat., ch. 49, § 2522.

On August 8, 1907, Marchie Tiger sold and conveyed by warranty deed to the defendant in error, the Western Investment Company, certain of the said lands for the sum of $2,000.00, which was paid by the company. On July 1, 1907, Marchie Tiger sold and conveyed by warranty deed certain other of said lands to the Coweta Realty Company, and likewise sold and conveyed the same, in the same man-ner on July 26, 1907, on August 8, 1907, and on August 13,

1907, to the Coweta Realty Company, the consideration agreed to be paid by the company was $3,000.00, of which $558.00 was paid. The plaintiff in error offered to return the amounts paid by the respective purchasers, and made tender thereof which was refused, and this suit is brought to have the deeds in question cancelled, and the claim set aside as a cloud upon plaintiff's title.

Each and all of these conveyances were made without the approval of the Secretary of the Interior. The Supreme Court of Oklahoma held the conveyances valid and denied relief to the plaintiff in error. 21 Oklahoma, 630.

Two questions arise in the case. First: Could a full-blood Creek Indian, on and after the eighth day of August, 1907, convey the lands inherited by him from his relatives, who were full-blood Creek Indians, which lands had been allotted to them, so as to give a good title to the purchaser—although the conveyance was made without the approval of the Secretary of the Interior. Second: If the legislation of Congress in question undertook to make such conveyances valid only when approved by the Secretary of the Interior, is it constitutional?

An answer to these questions requires a consideration of certain treaties and legislation concerning title to these lands. In 1833, the United States made a treaty with the Creek nation of Indians, in consideration of which they were to move to a new country west of the Mississippi, and to surrender all the lands held by them east of the Mississippi, and the United States agreed to convey to them a tract of land comprising what is now a part of the State of Oklahoma.

On August 11, 1852, in pursuance of this treaty the United States issued a patent for the tract of country mentioned, in which it was recited that the grantor, "in consideration of the premises and in conformity with the above recited provisions of the treaty aforesaid, has given

and granted, and by these presents does give and grant unto, the Muskogee (Creek) Tribe of Indians the tract of country above mentioned, to have and to hold the same unto the said tribe of Indians so long as they shall exist . as a·nation and continue to occupy the country hereby assigned to them."

Upon this tract of land the Creeks became a settled people, and established a government. In 1893 the United States in pursuance of a policy which looked to the final dissolution of the tribal Government, took steps toward the distribution and allotment of the lands among the members of the tribe. On March 3, 1893, Congress passed an act (27 Stat. 645, chap. 209) which provides:

"SEC. 15. The consent of the United States is hereby given to the allotment of lands in severalty not exceeding one hundred and sixty acres to any one individual within the limits of the country occupied by the Cherokees, Creeks, Choctaws, Chickasaws and Seminoles; . . . and upon the allotment of the lands held by said tribes the reversionary interest of the United States therein shall be relinquished and shall cease."

Section 16 of the act provides for the appointment of commissioners to enter upon negotiations with the Cherokee, Choctaw, Chickasaw, Creek and Seminole Nations looking to the extinguishment of the tribal title to lands in . the territory held by the nations or tribes, whether by cession of the same, or some part thereof, to the United States, or by allotment and division thereof in severalty among the Indians of such nations or tribes, or by such other method as may be agreed upon by such nations or tribes with the United States with a view to such adjustment on the basis of justice and equity, as might, with the consent of such nations or tribes, so far as might be necessary, be requisite and suitable to enable the ultimate creation of a State or States of the Union, which shall embrace the lands within the Indian Territory.

After negotiations and legislation looking to the enrollment of the tribes entitled to citizenship, an act of Congress known as the Original Creek Agreement was passed. (Act of March 1, 1901, c., 676, 31 Stat. 861.)

Section 7 of that act contains certain restrictions upon the title of individual Indians after the same had been conveyed to them by the Creek Nation, with the approval of the Secretary of the Interior. Section 7 of the act of March 1, 1901, was amended by the act of June 30, 1902, 32 Stat. 500, c. 1323, known as the Supplemental Creek Agreement.

Section 16 of the act superseded § 7 of the first Creek agreement, and, as it contains the restriction on alienation of allotted lands, important to be considered, so much of that section as contains such restrictions is here quoted:

"SEC. 16. Lands allotted to citizens shall not in any manner whatever or at any time be encumbered, taken, or sold to secure or satisfy any debt or obligation, nor be alienated by the allottee or his heirs before the expiration of five years from the date of the approval of this supplemental agreement, except with the approval of the Secretary of the Interior. Each citizen shall select from his allotment forty acres of land, or a quarter of a quarter section, as a homestead, which shall be and remain nontaxable, inalienable, and free from any incumbrance whatever for twenty-one years from the date of the deed therefor, and a separate deed shall be issued to each allottee for his homestead, in which this condition shall appear."

This agreement was ratified by the action of the Creek National Council, and approved by the President of the United States August 8, 1902.

It is thus apparent that the five-year limitation created by § 16 of the act of 1902, upon the alienation of lands by the Creek Indians had expired when the conveyances in controversy were made.

Within that five years, and about fifteen months before the expiration thereof, Congress passed the act of April 26, 1906 (34 Stat. 137, c. 1876), entitled an act to provide for the final disposition of the affairs of the Five Civilized Tribes in the Indian Territory, and for other purposes.

Sections 19, 20, 22 and 23 of the act are important to be considered, and are given in full in the margin.[1]

---

[1] "SEC. 19. That no full-blood Indian of the Choctaw, Chickasaw, Cherokee, Creek or Seminole tribes shall have power to alienate, sell, dispose of, or encumber in any manner any of the lands allotted to him for a period of twenty-five years from and after the passage and approval of this act, unless such restriction shall, prior to the expiration of said period, be removed by act of Congress; and for all purposes the quantum of Indian blood possessed by any member of said tribes shall be determined by the rolls of citizens of said tribes approved by the Secretary of the Interior: Provided, however, that such full-blood Indians of any of said tribes may lease any lands other than homesteads for more than one year under such rules and regulations as may be prescribed by the Secretary of the Interior; and in case of the inability of any full-blood owner of a homestead, on account of infirmity or age, to work or farm his homestead, the Secretary of the Interior, upon proof of such inability, may authorize the leasing of such homestead under such rules and regulations: Provided, further, that conveyances heretofore made by members of any of the Five Civilized Tribes subsequent to the selection of allotment and subsequent to removal of restriction, where patents thereafter issue, shall not be deemed or held invalid solely because said conveyances were made prior to issuance and recording or delivery of patent or deed, but this shall not be held or construed as affecting the validity or invalidity of any such conveyance, except as hereinabove provided; and every deed executed before or for the making of which a contract or agreement was entered into before the removal of restrictions, be and the same is hereby declared void: Provided further, That all lands upon which restrictions are removed shall be subject to taxation, and the other lands shall be exempt from taxation as long as the title remains in the original allottee.

"SEC. 20. That after the approval of this act all leases and rental contracts, except leases and rental contracts for not exceeding one year for agricultural purposes for lands other than homesteads of full-blood allottees of the Choctaw, Chickasaw, Cherokee, Creek and Seminole tribes shall be in writing, and subject to approval by the Secretary of

Section 28 of the act provides for the continuance of the tribal governments of the Choctaw, Chickasaw, Cherokee, Creek and Seminole tribes or nations, but places certain restrictions upon their right of legislation, making the same subject to the approval of the President of the United States.

Section 29 of the act provides that all acts, and parts of acts, inconsistent with the provisions of the act be repealed.

As § 22 of the act is the one upon which the rights of the parties most distinctly turn, we here insert it: ·

the Interior and shall be absolutely void and of no effect without such approval: Provided, That allotments of minors and incompetents may be rented or leased under order of the proper court: Provided further, that all leases entered into for a period of more than one year shall be recorded in conformity to the law applicable to recording instruments now in force in said Indian Territory.

"Sec. 22. That the adults heirs of any deceased Indian of either of the Five Civilized Tribes whose selection has been made, or to whom a deed or patent has been issued for his or her share of the land of the tribe to which he or she belongs or belonged, may sell and convey the lands inherited from such decedent; and if there be both adult and minor heirs of such decedent then such minors may join in a sale of such lands by a guardian duly appointed by the proper United States Court for the Indian Territory; and in case of the organization of a State or Territory, then by a proper court of the county in which said minor or minors may reside, or in which said real estate is situated, upon an order of such court made upon petition filed by guardian. All conveyances made under this provision by heirs who are full-blood Indians are to be subject to the approval of the Secretary of the Interior, under such rules and regulations as he may prescribe.

"Sec. 23. Every person of lawful age and sound mind may by last will and testament devise and bequeath all of his estate, real and personal, and all interest therein; Provided, That no will of a full-blood Indian devising real estate shall be valid, if such last will and testament disinherits the parent, wife, spouse or children of such full-blood Indian, unless acknowledged before and approved by a judge of the United States Court for the Indian Territory or a United States Commissioner." 34 Stat. L. 137.

"SEC. 22. That the adult heirs of any deceased Indian of either of the Five Civilized Tribes whose selection has been made, or to whom a deed or patent has been issued for his or her share of the land of the tribe to which he or she belongs or belonged, may sell and convey the lands inherited from such decedent; and if there be both adult and minor heirs of such decedent, then such minors may join in a sale of such lands by a guardian duly appointed by the proper United States court for the Indian Territory. And in case of the organization of a State or Territory, then by a proper court of the county in which said minor or minors may reside or in which said real estate is situated, upon an order of such court made upon petition filed by guardian. All conveyances made under this provision by heirs who are full-blood Indians are to be subject to the approval of the Secretary of the Interior, under such rules and regulations as he may prescribe."

It is the contention of the defendants in error that this section, when read in connection with § 16 of the act of 1902, above quoted, has the effect to require conveyances made by full-blood Indian heirs during the period from the passage of the act, of which § 22 is a part, until the expiration of the five years period named in § 16, to be approved by the Secretary of the Interior, but does not interfere with the capacity of such full-blood Indian heirs to convey the inherited lands after the expiration of the five years. This was the view entertained by the Supreme Court of Oklahoma in deciding this case.

In support of that view, it is insisted that the last sentence of § 22 must be read as a proviso, limiting and qualifying that which has gone before in the same section; that without this proviso the first part of the section would enable adult heirs of full blood to convey their inherited lands notwithstanding the five years limitation provided in § 16 had not expired, and that the real purpose of this section was to place such full-blood Indian heirs under

the protection of the Secretary of the Interior, so far as his approval was required, until the expiration of the five-year period named in § 16.

On the other hand, it is contended that the act of April 26, 1906, in the sections referred to, has undertaken to make new provision for the protection of full-blood Indians of the Five Civilized Tribes, and to place them, as to the alienation, disposition, and encumbrance of their lands, under restrictions such as shall operate to protect them, and to require the Secretary of the Interior to approve such conveyances, in order that such Indians shall part with their lands only upon fair remuneration, and when their interests have been duly safe-guarded by competent authority.

Previous legislation upon this subject differed as to the several nations.

As to the Seminoles, at the time of the passage of the act of April 26, 1906, the law forbade alienation prior to the date of the patent. The patent was to be made by the principal chief of the tribe when the tribal government ceased to exist. July 1, 1898, 30 Stat. 567, ch. 542.

The legislation concerning the Creeks we have already recited. Alienation was forbidden until expiration of the five-year period, to-wit: until August 8, 1907.

One section (14) of the Cherokee act provides there shall be no alienation within five years from the ratification of the act: another section (15) provides that Cherokee allotments, except homesteads, shall be alienable in five years after the issue of the patent. July 1, 1902, 32 Stat. 716, ch. 1375.

The Choctaw and Chickasaw act provided (§ 16) that:

"All lands allotted to the members of said tribes, except such land as is set aside to each for a homestead as herein provided, shall be alienable after issue of patent as follows: One-fourth of the acreage in one year, one-fourth acreage in three years, and the balance in five years—in each case

VOL. CCXXI—20

from the date of the patent; provided, that such lands shall not be alienable by the allottee or his heirs at any time before the expiration of the Choctaw and Chickasaw tribal governments for less than its appraised value." Act of July 1, 1902, 32 Stat. 641, 643, ch. 1362.

In this case we are concerned with the construction of the act of April 26, 1906, so far as it involves the Creeks, and other statutes are mentioned with a view to aid in the construction of that act. It is the contention of the plaintiff in error that the act of April 26, 1906, repealed all former legislation upon the subject, and intended to provide, as to full-blood Indians of the tribes, new and important protection in the disposition of their landed interests, and that, as the act provides that previous inconsistent legislation shall be repealed, so far as the same subjects are covered in the new act it was intended to give additional protection to full-blood Indians and to prevent them from being deprived without adequate consideration of their lands and holdings; and that the real purpose of § 22, in so far as the adult heirs of the deceased Indians of the Five Civilized Tribes are concerned, is to subject conveyances of such lands, when made by full-blood Indians, to the approval of the Secretary of the Interior.

We think a consideration of this act and of subsequent legislation *in pari materia* therewith demonstrates the purpose of Congress to require such conveyances by full-blood Indians to be approved by the Secretary of the Interior.

The sections of the act of April 26, 1906, under consideration show a comprehensive system of protection as to such Indians. Under § 19 they are not permitted to alienate, sell, dispose of, or encumber allotted lands within twenty-five years unless Congress otherwise provides. The leasing of their lands, other than homesteads, for more than one year may be made under rules and regulations prescribed by the Secretary of the Interior. And in case of

the inability of a full-blood Indian, already owning a homestead, to work or farm the same, the Secretary may authorize the leasing of such homestead.

Under § 20 leases and rental contracts of full-blood Indians, with certain exceptions, are required to be in writing, subject to the approval of the Secretary of the Interior. Under § 23 authority is given "to all persons of lawful age and sound mind to devise and bequeath all his estate, real and personal, and all interest therein;" but no will of a full-blood Indian, devising real estate and disinheriting parent, wife, spouse, or children of a full-blood Indian, is valid until acknowledged before and approved by a judge of a United States court in the Territory or by the United States Commissioner.

Coming now to § 22, the first part of that section gives the adult heirs of any deceased Indian of either of the Five Civilized Tribes power to sell and convey the inherited lands named, with certain provisions as to joining minor heirs by guardians in such sales. This part of the statute would enable full-blood Indians, as well as others, to convey such lands as adult heirs of any deceased Indian, etc., but the last sentence of the section requires the conveyance made under this provision, that is, conveyances made by adult heirs of the character named in the first part of the section, when full-blood Indians, to be subject to the approval of the Secretary of the Interior. This construction is in harmony with the other provisions of the act, and gives due effect to all the parts of § 22. True, it has the effect to extend the requirement of the approval of the Secretary of the Interior as to full-blood Indians beyond the terms prescribed in § 16 of the act of 1902, and this, we think, was the purpose of Congress, which is emphasized in § 29 of the act wherein all previous inconsistent acts, and parts of acts, are repealed.

As to the argument that the last sentence of § 22 is to be construed as a proviso intended to limit the generality of

the previous part of the section, and not to affect prior legislation upon the subject, it may be observed: the sentence does not take the ordinary character of a proviso, and is not introduced as such, and, even if regarded as a proviso, it is well-known that independent legislation is frequently enacted by Congress under the guise of a proviso. *Interstate Commerce Commission* v. *Baird*, 194 U. S. 25, 36, and previous cases in this court therein cited.

Had Congress intended not to interfere with full-blood Indian heirs in their right to make conveyances after the expiration of the five years named in § 16 of the act of 1902, it would have been easy to have said so, and some reference would probably have been made to the prior legislation. No reference is made to the prior legislation, but it is broadly enacted that all conveyances of the character named in § 22 made by heirs of full-blood Indians shall be subject to the approval of the Secretary of the Interior.

The construction contended for by the defendant in error places Congress in the attitude of requiring such conveyances to be made with the approval of the Secretary of the Interior for the time between the passage of the act of 1906 and the expiration of the period named in the act of 1902, with unrestricted power thereafter to make such conveyances without such approval. Such construction is inconsistent with subsequent legislation of Congress upon the same subject, and which proceeds upon the theory that, in the understanding of Congress at least, restrictions still existed so far as the inherited lands of full-blood Indians were concerned.

Section 8 of the Act of May 27, 1908, 35 Stat. 312, c. 199, provides:

"SEC. 8. That section 23 of an act entitled 'An act to provide for the final disposition of the affairs of the Five Civilized Tribes in the Indian Territory, and for other purposes,' approved April 26th, 1906, is hereby amended

by adding, at the end of said section the words, 'or a judge of a county court of the State of Oklahoma.'"

Section 9 of that act provides:

"SEC. 9. That the death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of said allottee's land: Provided, that no conveyance of any interest of any full-blood Indian heir in such land shall be valid unless approved by the court having jurisdiction of the settlement of the estate of said deceased allottee;" etc., etc. (35 Stat. 312.)

The obvious purpose of these provisions is to continue supervision over the right of full-blood Indians to dispose of lands by will, and to require conveyances of interests of full-blood Indians in inherited lands to be approved by a competent court.

When several acts of Congress are passed touching the same subject-matter, subsequent legislation may be considered to assist in the interpretation of prior legislation upon the same subject. *Cope* v. *Cope*, 137 U. S. 682; *United States* v. *Freeman*, 3 How. 556.

We cannot believe that it was the intention of Congress, in view of the legislation which we have quoted, to leave untouched the five-year restriction of the act of 1902, so far as the inherited lands of full-blood Indians are concerned, or to permit the same to be conveyed without restriction from the expiration of that five-year period until the enactment of the legislation of May, 1908.

In passing the enabling act for the admission of the State of Oklahoma, where these lands are, Congress was careful to preserve the authority of the Government of the United States over the Indians, their lands and property, which it had prior to the passage of the act. June 16, 1906, 34 Stat. 267, c. 3335.

We agree with the construction contended for by the plaintiff in error, and insisted upon by the Government, which has been allowed to be heard in this case, that the

act of April, 1906, while it permitted inherited lands to be conveyed by full-blood Indians, nevertheless intended to prevent improvident sales by this class of Indians, and made such conveyance valid only when approved by the Secretary of the Interior.

The further question arises in this case—In view of the construction we have given the legislation of Congress, is it constitutional? It is insisted that it is not, because the Indian is a citizen of the United States and entitled to the protection of the Constitution, and that to add to the restrictions of the act of 1902 those contained in subsequent acts is violative of his constitutional rights and deprives him of his property without due process of law. It is to be noted in approaching this discussion that this objection is not made by the Indian himself; he is here seeking to avoid his conveyance. It is not made by the Creek Nation or Tribe, for it is stated without contradiction that the act of 1906 has been ratified by the council of that nation.

The unconstitutionality of the act is asserted by the purchasers from an Indian, who are the defendants in error here, and proceeds upon the assumption, that the Indian, at the time of the conveyance, August 8, 1907, had full legal title to the premises, which could not be impaired by legislation of Congress subsequent to the act of June 30, 1902.

Assuming that the defendants in error are in a position to assert such constitutional rights, is there anything in the fact that citizenship has been conferred upon the Indians, or in the changed legislation of Congress upon the subject, which marks a deprivation of such rights? We must remember in considering this subject that the Congress of the United States has undertaken from the earliest history of the Government to deal with the Indians as dependent people and to legislate concerning their property with a view to their protection as such. *Chero-*

*kee Nation v. Georgia*, 5 Peters 1, 17; *Elk* v. *Wilkins*, 112
U. S. 94, 99; *Stephens* v. *Choctaw Nation*, 174 U. S. 445,
484. We quote two of the many recognitions of this
power in this court:

"The power of the General Government over these
remnants of a race once powerful, now weak and dimin-
ished in numbers, is necessary to their protection, as well
as to the safety of those among whom they dwell. It
must exist in that Government because it never has existed
anywhere else, because the theatre of its exercise is within
the geographical limits of the United States, because it
has never been denied, and because it alone can enforce
its laws on all tribes." *United States* v. *Kagama*, 118 U. S.
375, 384.

"Plenary authority over the tribal relations of the In-
dians has been exercised by Congress from the beginning,
and the power has always been deemed a political one,
not subject to be controlled by the judicial department of
the Government." *Lone Wolf* v. *Hitchcock*, 187 U. S.
553, 565.

Citizenship, it is contended, was conferred upon the
Creek Indians by the act of March 3, 1901, 31 Stat. 447,
amending the act of February 8, 1887, 24 Stat. 390, c.
119, by adding to the Indians given citizenship under that
act "every Indian in the Indian Territory." So amended,
the act would read as to such Indian: "He is hereby de-
clared to be a citizen of the United States and entitled to all
the rights, privileges and immunities of such citizen."
Is there anything incompatible with such citizenship in
the continued control of Congress over the lands of the
Indian? Does the fact of citizenship necessarily end the
duty or power of Congress to act in the Indian's behalf?

Certain aspects of the question have already been set-
tled by the decisions of this court. That Congress has full
power to legislate concerning the tribal property of the
Indians has been frequently affirmed. *Cherokee Nation* v.

*Hitchcock*, 187 U. S. 294, 308; *United States* v. *Rickert*, 188 U. S. 432; *McKay* v. *Kalyton*, 204 U. S. 458.

Nor has citizenship prevented the Congress of the United States from continuing to deal with the tribal lands of the Indians.

In *Cherokee Nation* v. *Hitchcock*, 187 U. S. 294, 307, Mr. Justice White, speaking for the court, said:

"There is no question involved in this case as to the taking of property; the authority which it is proposed to exercise by virtue of the act of 1898, has relation merely to the control and development of the tribal property, which still remains subject to the administrative control of the Government, even though the members of the tribe have been invested with the status of citizenship under recent legislation."

In *United States* v. *Rickert*, 188 U. S. 432, Mr. Justice Harlan, speaking for the court, said:

"These Indians are yet wards of the Nation, in a condition of pupilage or dependency, and have not been discharged from that condition. They occupy these lands with the consent and authority of the United States; and the holding of them by the United States under the act of 1887, and the agreement of 1889, ratified by the act of 1891, is part of the national policy by which the Indians are to be maintained as well as prepared for assuming the habits of civilized life and ultimately the privileges of citizenship."

To the same effect have been the decisions of Circuit Courts of Appeals dealing with this subject. In the Circuit Court of Appeals for the Eighth Circuit this apposite language was used by Judge Thayer in speaking for the court:

"We know of no reason, nor has any been suggested, why it was not competent for Congress to declare that these Indians should be deemed citizens of the United States, and entitled to the rights, privileges and immunities

of citizens, while it retained, for the time being, the title
to certain lands, in trust for their benefit, and withheld
from them for a certain period the power to sell, lease or
otherwise dispose of their interest in such lands.   It is
competent for a private donor, by deed or other convey-
ance, to create an estate of that character; that is to say,
it is competent for a private person to make a conveyance
of real property, and to withhold from the donee, for a
season, the power to sell or otherwise dispose of it.   And
we can conceive no sufficient reason why the United States,
in the exercise of its sovereign power, should be denied
the right to impose similar limitations, especially when
it is dealing with a dependent race like the Indians, who
have always been regarded as the wards of the Govern-
ment.   Citizenship does not carry with it the right on the
part of the citizen to dispose of land which he may own
in any way that he sees fit without reference to the char-
acter of the title by which it is held.   The right to sell
property is not derived from, and is not dependent upon,
citizenship; neither does it detract in the slightest degree
from the dignity or value of citizenship that a person is,
not possessed of an estate, or, if possessed of an estate, that
he is deprived for the time being, of the right to alienate
it."   Beck v. Flournoy Live Stock Co., 65 Fed. Rep. 30, 35.

To the same effect is Rainbow v. Young, 161 Fed. Rep.
835, in which the opinion was by Circuit Judge, now Mr.
Justice Van Devanter.   In that case, after referring to
the fact that while the members of the Winnebago tribe
had received allotments in severalty and had become
citizens of the United States and of the State of Nebraska,
their tribal relation had not terminated, and they were
still unable to alienate, mortgage or lease their allotments
without the consent of the Secretary of the Interior,
Judge Van Devanter said: "In short, they are regarded
as being in some respects still in a state of dependency
and tutelage, which entitles them to the care and protec-

tion of the national Government; and when they shall be let out of that state is for Congress alone to determine." The *Rainbow Case* was cited with approval by Mr. Justice Brewer in delivering the opinion in *United States* v. *Sutton*, 215 U. S. 291, 296.

Much reliance is placed upon *Matter of Heff*, 197 U. S. 488. In that case it was held that a conviction could not be had under the Federal statute for selling liquor to an Indian, the sale not being on a reservation, and the Indian having been made a citizen and subject to the civil and criminal laws of the State. In that case the opinion was by Mr. Justice Brewer, who also delivered the opinion in the case of *United States* v. *Celestine*, 215 U. S. 278.

In the *Celestine Case* it was held that although an Indian had been given citizenship of the United States, and of the State in which an Indian reservation was located, the United States might still retain jurisdiction over him for offenses committed within the limits of the reservation. In the opinion the subject was fully reviewed by Mr. Justice Brewer. In the course of it he quoted with approval from the opinion of Mr. Justice McKenna, sitting as a Circuit Judge, in *Eells* v. *Ross*, 12 C. C. A. 205, holding that the act of 1887, conferring citizenship upon the Indians, did not emancipate them from control or abolish the reservation. Mr. Justice Brewer also quoted from the *Heff Case*, commenting upon the change of policy in the Government which looked to the establishment of the Indians in individual homes, free from National guardianship, charged with the rights and obligations of citizens of the United States, and held that it was for Congress to determine when and how the relation of guardianship theretofore existing should be determined; and after quoting from the *Heff Case*, said (215 U. S. 290):

"Notwithstanding the gift of citizenship, both the defendant and the murdered woman remained Indians by race, and the crime was committed by one Indian

upon the person of another, and within the limits of a reservation.   Bearing in mind the rule that the legislation of Congress is to be construed in the interest of the Indian, it may fairly be held that the statute does not contemplate a surrender of jurisdiction over an offense committed by one Indian upon the person of another Indian within the limits of the reservation; at any rate, it cannot be said to be clear that Congress intended by the mere grant of citizenship to renounce entirely its jurisdiction over the individual members of this dependent race."

In *United States* v. *Sutton, supra,* following *United States* v. *Celestine,* it was held that jurisdiction continued over the Indians as to offenses committed within the limits of an Indian reservation, and that Congress might prohibit the introduction of liquor into the Indian country. In *Matter of Heff, supra,* this court said (p. 509): "But the fact that property is held subject to a condition against alienation does not affect the civil or political status of the holder of the title."

Taking these decisions together, it may be taken as the settled doctrine of this court that Congress, in pursuance of the long-established policy of the Government, has a right to determine for itself when the guardianship which has been maintained over the Indian shall cease. It is for that body, and not the courts, to determine when the true interests of the Indian require his release from such condition of tutelage.

The privileges and immunities of Federal citizenship have never been held to prevent governmental authority from placing such restraints upon the conduct or property of citizens as is necessary for the general good.   Incompetent persons, though citizens, may not have the full right to control their persons and property.   The privileges and immunities of citizenship were said, in the *Slaughter-House Cases,* (16 Wall. 36, 76), to comprehend:

"Protection by the Government with the right to ac-

quire and possess property of every kind, and to pursue and obtain happiness and safety, subject, nevertheless, to such restraints as the Government may prescribe for the general good of the whole."

Conceding that Marchie Tiger by the act conferring citizenship obtained a status which gave him certain civil and political rights, inhering in the privileges and immunities of such citizenship unnecessary to here discuss, he was still a ward of the Nation so far as the alienation of these lands was concerned, and a member of the existing Creek Nation. The inherited lands, though otherwise held in fee, were inalienable without the consent of the Secretary of the Interior, until August, 1907, by virtue of the act of Congress. In this state of affairs Congress, with plenary power over the subject, by a new act permitted alienation of such lands at any time subject only to the condition that the Secretary of the Interior should approve the conveyance.

Upon the matters involved our conclusions are that Congress has had at all times, and now has, the right to pass legislation in the interest of the Indians as a dependent people; that there is nothing in citizenship incompatible with this guardianship over the Indian's lands inherited from allottees as shown in this case; that in the present case when the act of 1906 was passed, the Congress had not released its control over the alienation of lands of full-blood Indians of the Creek Nation; that it was within the power of Congress to continue to restrict alienation by requiring, as to full-blood Indians, the consent of the Secretary of the Interior to a proposed alienation of lands such as are involved in this case; that it rests with Congress to determine when its guardianship shall cease, and while it still continues it has the right to vary its restrictions upon alienation of Indian lands in the promotion of what it deems the best interest of the Indian.

As we have construed the statute involved, while it per-

mits the conveyance of inherited lands of the character of those in issue, it requires such conveyance to be made with the approval of the head of the Interior Department.

For the reasons we have stated, we find nothing unconsitutional in the act making this requirement.

The judgment of the Supreme Court of Oklahoma is reversed, and the cause remanded to that court for further proceedings not inconsistent with this opinion.

*Reversed.*