UNITED STATES *v.* STONE & DOWNER CO. ET AL. (No. 2463)[1]

PARAGRAPH 18, EMERGENCY TARIFF ACT OF 1921—"WOOL COMMONLY KNOWN AS CLOTHING WOOL"—COMMERCIAL DESIGNATION—JUDICIAL NOTICE.

Presumptively, common and commercial meanings coincide. The court judicially knows the common meanings of words, but may consult authorities and receive testimony as a refreshment of the judicial memory. Tariff laws are couched in the language of commerce; and a tariff term shown to have a commercial meaning different from its common meaning will be so interpreted. But the expression "clothing wool" appears to have only one meaning, which is a short-stapled wool prepared by carding, as distinguished from combing wool, which is a long-stapled wool prepared by combing. Consequently, the provision of paragraph 18, emergency tariff act of 1921, for "wool, commonly known as clothing wool," includes such wool only; and the fact that combing wool is also used for making clothing does not bring it within the provision.— Stone & Downer Co. et al. *v.* United States (12 Ct. Cust. Appls. 62; T. D. 40019).

## United States Court of Customs Appeals, March 23, 1925

APPEAL from Board of United States General Appraisers, G. A. 8842 (T. D. 40368)

[Affirmed.]

*William W. Hoppin,* Assistant Attorney General (*Charles D. Lawrence,* special attorney, of counsel), for the United States.

*Sharretts, Coe & Hillis* and *Waterhouse & Lockett* (*George J. Puckhafer,* associate counsel, and *Edward P. Sharretts* of counsel) for appellees.

[Oral argument January 29, 1925, by Mr. Lawrence and Mr. Sharretts]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

BLAND, Judge, delivered the opinion of the court:

The Government appeals from the judgment of the Board of General Appraisers in T. D. 40368 (G. A. 8842), sustaining protests of the importers and reversing the collector of customs in assessing duty under paragraph 18 of the emergency tariff act of May 27, 1921, upon certain wool, woolen cloth, and yarn importations made at the port of Boston.

Paragraph 18 is as follows:

18. Wool, commonly known as clothing wool, including hair of the camel, angora goat, and alpaca, but not such wools as are commonly known as carpet wools, etc.

At the trial below it was stipulated that the wool covered by protests 945882/11410, 945938/11385, and 956790/11920 is in every essential and material respect the same as Exhibits 1 to 12, inclusive, in suit No. 2245, decided by the United States Court of Customs Appeals in Stone & Downer Co. et al. *v.* United States (12 Ct. Cust. Appls. 62; T. D. 40019), dated November 17, 1923 (45 Treas. Dec. 167), and that the yarn covered by protest 950777/11585 consists of

---

worsted yarn and is in every essential and material respect the same as Exhibit 15 in said suit No. 2245.

It was further stipulated that the cloth covered by protest 949137/11507 consists of worsted cloth made from worsted yarn and is in every essential and material respect the same as Exhibit 14 in said suit No. 2245.

It was also stipulated that the record in said suit No. 2245, including the exhibits, shall be made a part of the record in this case.

Exactly the same questions are here involved as were before the court in the Stone & Downer case, supra. Some new evidence was introduced by both sides with reference to the meaning of "clothing wool." The new evidence throws no new light on the case, except that a reading of it confirms us in the opinion that wherever and whenever clothing wool is spoken of by anyone knowing the meaning of the term it means a short-stapled wool used in the carding process as distinguished from combing wool, which is used in the combing or worsted process.

The Government has argued that under the new evidence it has proven a common meaning, prevalent among our people, for the words "clothing wool" different from their commercial meaning and insists that Congress, when it used the words "commonly known as clothing wool," had reference to this meaning and not to the meaning given the words when used by those in the trade. If that fact had been established satisfactorily, the collector should have been sustained. We think the testimony in the case and the authorities consulted conclusively show the contrary.

The Government's new witnesses attempted to show experience or knowledge in the production, sale, and manufacture of wools and made an attempt to testify in dual capacities. As producers they very lamely maintained that clothing wool meant any wool that went into the making of clothing; but when they forgot their producers' experience and thought of wool from the trade viewpoint, then clothing wool meant a short-stapled wool used in the carding process. The Government sought to show, from witnesses purporting to be familiar with the question, what one unfamiliar with the question would say and think. As suggested by the trial court, why did not the Government bring in the man from the street who knew nothing about the grades of wool? It is apparent that those who defined clothing wool as "all wool that went into the making of clothing" either knew nothing about or ignored the meaning of the words "clothing wool" when used by anyone familiar with the subject.

In this whole record, which includes the record of the former case, there is no convincing testimony that the words "clothing wool" are ever used by anyone knowing anything about the subject except to describe the short-fibered wool, and it is apparent to us that

those who do not know the meaning of the words "clothing wool," rarely, if ever, refer to it as such, and, if they do, it would be to misapply the term. When we read the testimony of additional witnesses and consult additional authorities, it becomes more apparent that the common meaning of the words "clothing wool" is that it is the short-fibered wool.

We are asked to ignore the well settled and consistently followed canons of construction and give to the words used a meaning not sustained by the statute itself and inconsistent with all previous tariff legislative precedents. The Government invokes the broad and liberal rule of construction of the case of the Church of the Holy Trinity *v.* United States (143 U. S. 457), and asks us to say, contrary to the evidence and contrary to all recognized authorities, that clothing wool should be held to mean wool used for the making of clothing for the reason that there was an emergency for this kind of wool to receive protection in the home markets. This would be contrary to the use given the word in previous tariff acts and contrary to the common, ordinary use of the words

The illustration of "apples, commonly known as eating apples," was given. It is urged that we all know what "apples" means and that we all know what "eating" means. Therefore, if "eating apples" were in the tariff act, we would be required to say all apples that were to be eaten would be included within this term. This court happens to know that there is a common meaning for "eating apples" and that they are distinguished from "cooking apples," and that, if "eating apples" were used in a tariff schedule prefixed by the words "commonly known as" this court would be justified in holding "eating apples" did not mean all apples that were to be eaten; that Congress in using the term "eating apples" had reference to a class of apples which, although to be eaten, were separate and distinct from cooking apples. The fact that some people who eat apples, but who know nothing about the meaning in which the term is used by those familiar with the terms, might define them as any apples that could be eaten, would not obligate this court to accept such meaning, nor could its refusal to accept such meaning be regarded as its acceptance of a commercial term not commonly used.

The Government propounded the inquiry, if there is a common meaning to the words "clothing wool" and if they are unambiguous, why have witnesses testified as to their meaning? We think the answer is so apparent as to hardly need statement. A word in the tariff act may be used in its common sense, be unambiguous and yet be not understood by one having no knowledge of the question. To those having information on the subject it may be free from ambiguity and, to them, it may be used in its common or only sense. We can conceive of a great many things listed in a tariff

statute that are used in their common sense which would require explanation and identification in order that the classifier might satisfy himself that they were used in that sense.

The Government contends that the words "commonly known as clothing wool" are ambiguous and that they, therefore, require explanation, and that the history of the legislation and all facts connected with the passage of the act, including debates in Congress, reports, etc., should be and must be resorted to in construing their meaning. In the Stone & Downer case, supra, we held that the words were not ambiguous and that extrinsic facts and the history of the legislation, even if persuasive, could not be permitted to override a plain meaning as expressed by the words used in the act. This subject was thoroughly discussed in the former case and the rule is so plain, so well settled, and so uniformly adhered to by the Supreme Court of the United States, as well as practically almost every known judicial tribunal, that it requires no elaboration here. Bate Refrigerating Co. v. Sulzberger (157 U. S. 1); Pennsylvania R. Co. v. International Coal Min. Co. (230 U. S. 184); Omaha & C. B. Street R. Co. v. Interstate Commerce Commission (230 U. S. 324).

If we were permitted to go into these facts, as counsel have gone into them in the argument, it would be an interesting but difficult problem to know what weight to give to certain of these facts which can be used to support either contention before us. It may be urged that some Congressmen voted for the bill as it appeared with the belief that combing wool had been omitted so as to encourage the worsted industry. in the United States. Other Members may have voted for it for an entirely different reason. Surely we can not be permitted to speculate as to why Congress, as a whole or as individuals, would wish to include or exclude one of the well-known grades of wool from the protective tariff provision. That is their business, not ours.

The amendment, offered by Senator Lodge, to strike out the words "commonly known as clothing wool" and insert "all wool" is illustrative of how unsatisfactory such testimony would be if we were permitted to enter that field. The importers and the Government, both, with equal plausibility, may point out how it reflects the understanding of one branch of Congress.

Since we are passing upon the meaning of certain words used in paragraph 18, it is important to note that the paragraph, after laying a duty upon clothing wool, says, "but not such wools as are commonly known as carpet wools." There are clothing carpet wools and combing carpet wools, well known to the trade. Carpet wools, while probably chiefly used in carpets, are also extensively used in making some kinds of wearing apparel, where coarseness of

texture is important or not objectionable, such as felt clothing. If wool commonly known as "clothing wool" is wool that goes into the making of clothing, then wool commonly known as "carpet wool" is wool that goes into the making of carpets. And, by the same reasoning, such wools as would ordinarily be classified as carpet wools and which are used in making clothing, should be charged a duty under paragraph 18.

We think when the statute said "commonly known as carpet wool" it had reference to that class of wool known to the trade and well understood by Congress in all of its legislative acts as that coarse fibered wool which is distinguished from the finer fibered clothing wools and combing wools. Where is carpet wool commonly known? Among the producers of wool, on the street, or in the trade? We feel certain that the Government would contend that there is no common meaning for carpet wool other than that given to it by those familiar with the grades of wool. As we said, in our former opinion, Congress, in dealing with the wool question in past years, has used its terms with precision and has never indicated that the common meaning of its words should be determined by the man on the street whose ignorance of the subject would constitute his qualification as an interpreter.

In our former opinion we have set out various expressions used in previous tariff acts from March 2, 1867, to 1921, when Congress was referring to wool. The terms used show that the framers of the paragraphs knew the wool business and knew the meaning of the terms used. The words "clothing wools" were frequently referred to and finally "clothing wools" were referred to as class I. The trade understood and the administrators of the act understood what "clothing wools" were and what class I was. They used the same words with the addition of the words "commonly known" in the emergency tariff, and now the Government contends that they used the words in a different sense and that, even if they did use the words "clothing wool" to describe a short-stapled wool in the many preceding acts, in the emergency tariff law they changed the meaning and used the words in a different sense.

Regardless of the weight we attach to this kind of consideration (see Tiger *v.* Western Investment Co., 221 U. S. 286) it is interesting at this point to examine the tariff act of 1922, passed by the same Congress with practically the same personnel. In paragraph 1101 carpet wool, formerly free, is first treated and a duty of 12 cents per pound is levied upon it. In the next paragraph all wools not specifically provided for receive a duty of 30 cents per pound. Here they departed from the use of the words "carpet wool," "clothing wool," and "combing wool." If the same Congress in 1921, when it said clothing

wool meant the wools referred to in 1922 in paragraph 1102, why did it not say so? And if it meant the same thing in 1922 that it meant in 1921, why did it not use the same language, "wool commonly known as clothing wool"? We think it used the words indicated for the very good reason that the framers of the act knew, as Congress had known for a half century, that the words "clothing wool" did not include combing wool.

The court may know, of its own knowledge, the common meaning of a word used in a tariff statute, and may need no outside help, but in its discretion it may consult the dictionaries, lexicons, and recognized authorities, and receive testimony as to the common meaning and application of the word. The fact that it hears testimony as to the common meaning and application of a word used in the act must not be confused with the question of proving commercial designation or a commercial meaning. The commercial meaning and the ordinary or common meaning are presumed to be the same, and, in the instance at hand, we think it is clear that they are the same—Acker v. United States (1 Ct. Cust. Appls. 328; T. D. 31431). Many subjects of importation may come into this country under a tariff act which names them definitely and in unambiguous terms, and at the same time this court may have no knowledge of their common meaning. In determining the meaning, should the court seek information from those who know less about the common meaning of the term than it does? If so, the blind would lead the blind into inextricable difficulties.

We have carefully consulted all available authorities with a view of determining the origin of the term "clothing wool." This search was made with the view that it might throw some light upon the sense in which the term is used in the act under consideration. But nowhere have we been able to find authority definitely establishing the origin or early history of the use of the words.

In this connection it is interesting and probably pertinent to note that in the carding process a carding machine is used, and that one of the essential parts of a carding machine is the "card clothing." In United States v. Leigh & Butler (7 Ct. Cust. Appls. 228; T. D. 36512) "card clothing" was defined as follows:

This so-called card clothing consists of strips of leather fastened upon the metal cylinders of a carding machine with rows of upright wire teeth upon them. When the cylinders rotate the wire teeth "card" the fiber which is fed to them.

It is there and elsewhere explained that the "card clothing" consists of the material and wire teeth which *clothe* the metal cylinders of the carding machine.

New English Dictionary, Volume II, page 110, defines the compound word "card-cloth" as *the leather or india rubber backing of a card; hence "card clothing."*

It is not far-fetched to assume that clothing wool had its origin from the fact that in the early days certain kinds of wool passed between the clothing of the cylinders of the carding machine. There is no definite authority for this statement more than above indicated, but it may throw some light upon the question. It, at least, seems more reasonable that this was its origin than to assume that it originated from the fact that short-stapled wool was used in the making of clothing, when we consider that long-stapled wool was always used for the same purpose.

The opinion in Stone & Downer case, supra, is sufficiently replete with authorities on all questions raised to obviate repetition here. The judgment of the Board of General Appraisers is *affirmed.*