FILED
United States Court of Appeals
Tenth Circuit

June 14, 2013

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DAVID BRIAN MAGNAN,

       Petitioner-Appellant,

v.

ANITA TRAMMELL, Warden,
Oklahoma State Penitentiary[*]; E.
SCOTT PRUITT, Attorney General,
State of Oklahoma,

       Respondents-Appellees.

---

SEMINOLE NATION OF
OKLAHOMA,

       Amicus Curiae.

No. 11-7072

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
(D.C. No. 6:09-CV-00438-RAW-KEW)**

---

Chad A. Readler of Jones Day, Columbus, Ohio, (Steven A. Broussard and
Michael J. Lissau of Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa,
Oklahoma; and Gary Peterson, Oklahoma City, Oklahoma, with him on the
briefs), for Petitioner-Appellant.

---

[*] Pursuant to Fed. R. App. P. 43(c)(2), Anita Trammell, who was appointed
Warden of Oklahoma State Penitentiary on February 28, 2013, is automatically
substituted for Randall G. Workman as Respondent in this case.

Seth S. Branham, Assistant Attorney General, (E. Scott Pruitt, Attorney General of Oklahoma, and Jennifer L. Crabb, Assistant Attorney General, on the brief), Oklahoma City, Oklahoma, for Respondent-Appellee.

Eugene K. Bertman and Jennifer Henshaw McBee of McCormick & Bryan, PLLC, Edmond, Oklahoma, filed an amicus curiae brief on behalf of the Seminole Nation of Oklahoma, Amicus Curiae.

---

Before **BRISCOE,** Chief Judge, **KELLY** and **HARTZ**, Circuit Judges.

---

**BRISCOE**, Chief Judge.

---

Petitioner David Magnan pleaded guilty in Oklahoma state court to three counts of murder in the first degree and one count of shooting with intent to kill. Magnan was sentenced to death for each of the murder convictions and to a term of life imprisonment on the remaining conviction. Magnan argued on direct review that the crimes occurred in "Indian country," 18 U.S.C. § 1151, and that, as a result, the state trial court lacked jurisdiction over the crimes. The Oklahoma Court of Criminal Appeals (OCCA) held, however, that a 1970 conveyance to the Housing Authority of the Seminole Nation of Oklahoma extinguished all Indian lands restrictions that had previously attached to the surface estate of the property where the crimes occurred. The OCCA further held that, even assuming that restrictions remained on 4/5ths of the mineral estate, such interest was unobservable and insufficient to deprive the State of Oklahoma of criminal jurisdiction over the surface property at issue. In a petition for writ of habeas

2

corpus filed pursuant to 28 U.S.C. § 2254, Magnan again asserted that the crimes at issue occurred in "Indian country" and that the state trial court was without jurisdiction. The district court denied Magnan's petition but granted him a certificate of appealability. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we need only address the status of the surface estate to agree with Magnan that the location where the crimes occurred was "Indian country" because the requirements to extinguish the restrictions placed on Indian lands by Congress were not met and that, as a result, the state trial court lacked jurisdiction over the crimes. Consequently, we reverse the judgment of the district court and remand with instructions to grant Magnan's petition for writ of habeas corpus.

I

In the early morning hours of March 3, 2004, James Howard and Karen Wolf were shot to death at a house in rural Seminole County, Oklahoma. Two other people, Lucilla McGirt and Eric Coley, were shot and wounded at the house. McGirt died approximately two weeks later from complications of her gunshot wounds. Coley survived his injuries. All of the victims, except for Howard, were enrolled members of the Seminole Nation of Oklahoma.

*The state trial proceedings*

On March 12, 2004, Magnan, an enrolled member of the Fort Peck Assiniboine and Sioux Tribes, was charged by felony information in the District Court of Seminole County with conspiracy to commit the crime of murder in the

3

first degree (Count I), two counts of shooting with intent to kill (Counts II and V), and two counts of murder in the first degree (Counts III and IV). On March 26, 2004, following the death of McGirt, an amended felony information was filed that charged Magnan with conspiracy to commit the crime of murder in the first degree (Count I), one count of shooting with intent to kill (Count II), and three counts of murder in the first degree (Counts III, IV, and V).

On July 22, 2004, the State filed a bill of particulars alleging the existence of five aggravating circumstances: (1) Magnan was previously convicted of a felony offense involving the use or threat of violence to the person (arson); (2) Magnan knowingly created a great risk of death to more than one person; (3) the murders were especially heinous, atrocious, or cruel; (4) the murders were committed by Magnan while serving a sentence of imprisonment on a conviction of a felony; and (5) the existence of a probability that Magnan would commit future criminal acts of violence that would constitute a continuing threat to society.

On May 10, 2005, Magnan appeared before the state trial court and pleaded guilty to Counts II through V of the amended information, i.e., one count of shooting with intent to kill and three counts of murder in the first degree. The State, in response, agreed to dismiss Count I of the amended information which, as noted, charged Magnan with conspiracy. "Before accepting [Magnan's] pleas, the [state trial court] received the results of a psychological competency

4

evaluation and conducted an in-court competency inquiry in which [it] found Magnan competent to enter the pleas." Magnan v. State, 207 P.3d 397, 401 (Okla. Crim. App. 2009) (Magnan I).

On July 6, 2005, Magnan appeared before the state trial court for sentencing. "Magnan stipulated to the aggravated circumstances pled in the State's bill of particulars, stated he had nothing to present in mitigation, waived any direct appeal, and asked to be sentenced to death for the murders." Id. The state trial court "sentenced Magnan to death on each of the murder counts and sentenced him to a term of life imprisonment on the shooting-with-intent-to-kill count." Id.

### Direct review by the OCCA

Magnan filed an appeal brief with the OCCA asserting seven propositions of error. The OCCA concluded that Magnan had waived his right to direct appeal. But the OCCA proceeded to review what it described as "two non-waivable issues" in the case. Id. First, the OCCA "consider[ed] whether th[e] crime[s] occurred in Indian [c]ountry and so [were] beyond the jurisdiction of the State of Oklahoma." Id. Second, the OCCA "conduct[ed] [its] statutorily required sentence review under [Okla. Stat tit. 21, § 701.13] and Rule 9.4, Rules of the Oklahoma Court of Criminal Appeals." Id.

With respect to the jurisdictional issue, the OCCA "granted Magnan's attorneys' request for a remand to the [state trial] court for an evidentiary

5

hearing." Id. at 402. On remand, the state trial court "heard evidence on Magnan's Indian status, the Indian status of the victims, the precise location of the property on which the murders occurred, and the title status of that property." Id. Although all of the witnesses who testified at the hearing agreed that the location of the murders qualified as Indian country under federal law, the state trial court nevertheless "concluded on remand that the property was not Indian [c]ountry and the State properly exercised jurisdiction over the crimes charged." Id. When the case returned to the OCCA, the majority of the court "agree[d] . . . with the [state trial] court's conclusion that the crimes committed in th[e] case did not occur in Indian [c]ountry and . . . that criminal jurisdiction was proper." Id. at 406. Judge Chapel filed a dissenting opinion disagreeing with both of these conclusions. Id. at 414-15.

As for the sentence review, the OCCA unanimously concluded "that the sentence imposed was based upon aggravating circumstances supported by the evidence and not under the influence of passion, prejudice, or any other arbitrary factor." Id. at 413.

Magnan filed a petition for writ of certiorari with the United States Supreme Court. On October 5, 2009, the Supreme Court denied Magnan's petition. Magnan v. Oklahoma, 130 S. Ct. 276 (2009).

### Magnan's federal habeas proceedings

Magnan initiated these federal habeas proceedings on November 13, 2009,

6

by filing a motion for appointment of counsel and a motion for leave to proceed in forma pauperis. Those motions were granted and, on August 2, 2010, Magnan's appointed counsel filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition alleged the following ground for relief:

> The Petitioner is an Indian and an enrolled member of the Fort Peck Assiniboine and Sioux Tribes. The charged offenses occurred on a 1.0123-acre tract of land in the E/2 of the NE/4 of the SW/4 of Section 3, Township 8 North, Range 5 East, Seminole County, Oklahoma. This tract is an Indian allotment having Indian title which has not been extinguished, because 80% of the surface estate and 80% of the mineral estate remain restricted from alienation. Jurisdiction over the charged offenses was thus exclusively federal under 18 U.S.C. § 1153(a). By convicting the Petitioner without jurisdiction, the Oklahoma courts violated § 1153(a) and the United States Constitution.

ROA, Vol. I, at 13-14.

On August 23, 2011, the district court issued an opinion and order denying Magnan's petition. The district court also that day entered judgment in the case and issued an order granting Magnan a certificate of appealability.

II

Magnan argues on appeal, as he did below, that his crimes were committed in Indian country. More specifically, Magnan argues that the tract of land where the crimes occurred was an "Indian allotment[], the Indian titles to which ha[d] not been extinguished." 18 U.S.C. § 1151(c). Therefore, Magnan argues, the federal government has exclusive criminal jurisdiction over his crimes pursuant to

7

the Indian Major Crimes Act, 18 U.S.C. § 1153.[1]  Magnan further argues that the

OCCA's "jurisdictional determination both turned on a clearly erroneous

interpretation of the factual record and contravenes established federal law and

Supreme Court precedent."  Aplt. Br. at 11.  Consequently, Magnan argues, he is

entitled to federal habeas relief from his Oklahoma state convictions and

sentences.[2]

*Standard of review*

It is undisputed that Magnan's habeas petition was filed after the effective

date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).

Consequently, Magnan concedes, as he must, that "this case arises under the . . .

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. §

2254."  Aplt. Br. at 16; see Snow v. Sirmons, 474 F.3d 693, 696 (10th Cir. 2007)

(holding that AEPDA applies to § 2254 habeas petitions filed after its effective

---

[1] The Indian Major Crimes Act provides, in pertinent part, that "[a]ny Indian who commits against . . . another Indian or other person . . . the . . . offenses [of] . . . murder, . . . assault with intent to commit murder, assault with a dangerous weapon, [or] assault resulting in serious bodily injury, . . . shall be subject to the same law and penalties as all other persons committing any of the . . . offenses, within the exclusive jurisdiction of the United States."  18 U.S.C. § 1153(a).

[2] Magnan expressly notes that these federal habeas proceedings are not intended to "question [his] guilt."  Aplt. Br. at 13.  Instead, Magnan argues that the "outcome [of this case] has life or death ramifications" because "the Seminole Tribe . . . has not agreed to application of the death penalty in its territory."  Id. As a result, he asserts, he "would not be eligible for the death penalty" if tried in federal court under the Indian Major Crimes Act.  Id. at 13-14.  We find it unnecessary to determine whether Magnan's assertions in this regard are correct.

8

date).

Generally speaking, AEDPA mandates that we apply a highly deferential standard of review to any claim addressed on the merits by the state courts. In particular, our standard of review of such claims is typically governed by 28 U.S.C. § 2254(d), which provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Magnan argues, however, that "the typical standard of review set out in AEDPA does not apply" here "because this case turns on jurisdictional questions, specifically, whether the controversy is one reserved solely to the federal courts for resolution." Aplt. Br. at 16-17. In this situation, he asserts, "the federal courts owe no deference to state court determinations," and instead "must review de novo both the facts and legal issues underlying this dispute." Id. at 17 (italics omitted).

Fortunately, we need not address this difficult question, or any of the

9

specific arguments forwarded by Magnan in support of his position, because we conclude that, even under the deferential standards of review outlined in AEDPA, the OCCA erred in concluding that the State of Oklahoma possessed criminal jurisdiction over the tract of land where the crimes at issue were committed. Thus, we shall simply assume, without deciding, that AEDPA's deferential standards of review apply to the OCCA's review of the jurisdictional issue raised by Magnan.

*The state trial court's jurisdiction*

We now turn to the critical issue raised by Magnan in this federal habeas proceeding, i.e., whether the property where his crimes occurred constituted "Indian country" under 18 U.S.C. § 1151. In addressing this issue, we begin by describing in detail the background of the property at issue. We then review the definition of "Indian country," as outlined in § 1151, and the various federal statutes bearing on the question of whether the property at issue fell within that definition at the time of Magnan's crimes. In turn, applying the AEDPA standards of review, we explain how the OCCA erred in its assessment of this jurisdictional issue. Lastly, applying de novo review due to the OCCA's error, we conclude that the property remained "Indian country" at the time of Magnan's crimes, and that, consequently, the State of Oklahoma lacked jurisdiction over the crimes.

10

*a) History of ownership of the property*

The crimes to which Magnan pleaded guilty occurred on a 1.0123 acre tract of land (the Tract) in rural Seminole County, Oklahoma.  The legal description of the Tract, to the extent it is relevant, is as follows:

> A tract of land containing 1.0123 acres, more or less, more particularly described as follows: Beginning at a point 3,247.00 feet South along the North and South quarter section line and 300.00 feet West along a line parallel to the North line of the E/2 NE/4 SW/4 of Section 3 from the Northeast Corner of the Northwest Quarter of Section 3, Township 8 North, Range 5 East, thence 210.00 feet West along a line parallel to the North line of the E/2 NE/4 SW/4 of Section 3, thence 210.00 feet South along a line parallel to the East line of the E/2 NE/4 SW/4 of Section 3, thence 210.00 feet East along a line parallel to the North line of the E/2 NE/4 SW/4 of Section 3, thence 210.00 feet North along a line parallel to the East line of the E/2 NE/4 SW/4 of Section 3 to the point of beginning.

State ROA at 113 (State Dist. Ct's Findings of Fact and Conclusions of Law, Jan. 2, 2008).

The Tract was part of a 200-acre property allotted in the early 20th century to Jimpsey Tiger (Jimpsey), a full-blooded member of the Seminole Nation. Jimpsey died on January 1, 1944, and left as his heirs: his second spouse Lena Tiger (Lena); his son George William Tiger (George); and daughters Corina Tiger (Corina), Mandy Tiger (Mandy), and Kizzie Tiger (Kizzie).  Each of these five heirs received a 1/5th surface interest and a 1/5 mineral interest.   Pursuant to the provisions of the Act of Congress of August 4, 1947 (the 1947 Act), ch. 458, 61 Stat. 731, all of the interests inherited by Jimpsey's heirs were restricted.

11

In 1950, George purchased from Lena her interest in the surface of the Tract. In doing so, George used restricted funds held in trust by the United States of America for his benefit. Later that same year, Kizzie used similar restricted funds held in trust for her benefit to purchase from George, Corina, and Mandy their interests in the surface of the Tract. The County Court of Seminole County, Oklahoma, acting pursuant to the provisions of the 1947 Act, approved the conveyances of these inherited interests to Kizzie. And, as required by the Act of Congress of May 27, 1908 (the 1908 Act), 35 Stat. 312, the Department of Interior, Bureau of Indian Affairs (BIA), approved the conveyance of the 1/5th purchased interest from George to Kizzie. As a consequence of these conveyances, Kizzie owned all the surface interests in the Tract, with a 1/5th interest having been inherited by her from her father, and the remaining 4/5ths interests having been purchased with funds held in trust by the BIA for her benefit. Kizzie also owned a 1/5th inherited interest in the minerals (i.e., the 1/5th interest that she inherited from her father).

The following restrictive clause was placed in the deed to the Tract noting that Kizzie could not convey or alienate the Tract without the approval of the Secretary of the Interior:

> To have and to hold said described premises unto the said grantee, her heirs and assigns, forever, free, clear, and discharged of all former grants, charges, taxes, judgments, mortgages, and other liens and encumbrances of whatsoever nature, subject to the condition that no lease, deed, mortgage, power of attorney, contract

12

to sell or other instrument affecting the land herein described or the title thereto shall be of any force and effect, unless approved by the Secretary of Interior, or the restrictions are otherwise removed by operation of law.

State ROA at 120.

In early 1970, Kizzie and her husband, Redmond Wolf, entered into a contract with the Housing Authority of the Seminole Nation of Oklahoma (Housing Authority) under the terms of which the Housing Authority agreed to construct a residence on the Tract for the benefit of Kizzie and her husband.[3] State Tr. of Hearing Exhibits (Dec. 13, 2007), Exh. 14 at 29-30. In turn, Kizzie and her husband were obligated under the terms of the contract to make certain monthly payments on the residence. Id. at 30. As part of this contract, on February 20, 1970, Kizzie and her husband executed a warranty deed for the surface rights to the Tract (while expressly reserving the mineral rights) in favor of the Housing Authority. The deed contained an express condition precedent, i.e., that the Housing Authority would, for the benefit of Kizzie and her husband, build a house on the Tract within two years from the date of the deed.

---

[3] According to its web site, the Housing Authority operates under the Housing and Urban Development (HUD) programs authorized by the Native American Assistance and Self Determination Act of 1996. See Housing Authority of the Seminole Nation, http://www.hasnok.org/ (last visited May 20, 2013). The Housing Authority utilizes funds from HUD's Indian Housing Block Grants, and its mission is to create affordable housing for members of the Seminole Nation. Id. The Housing Authority, in contracting with Kizzie and her husband, was acting pursuant to the terms of an Annual Contributions Contract entered into between itself and the Secretary of HUD.

Following the execution of the warranty deed, Kizzie and her husband filed a petition in the District Court of Seminole County, Oklahoma, seeking approval of the warranty deed. On April 16, 1970, the District Court of Seminole County held a hearing on the petition. Kizzie and her husband appeared in person with their attorney, James Groves. M. Dean Storts, a United States Trial Attorney working for the Department of the Interior, and as a successor to the United States Probate Attorney, also entered an appearance.[4] At the outset of the hearing, Kizzie's attorney stated that the "case involve[d] surface rights to" the Tract. Id. at 28. Kizzie was briefly questioned by her attorney during the hearing. No questions were posed of her by Storts.

At the conclusion of the hearing, the District Court of Seminole County issued a written order approving the deed.[5] That order recounted the history of the Tract at issue and concluded, in pertinent part:

> The Court further finds that the benefits to be gained by the Grantors, Petitioners herein [Kizzie and her husband], under the terms of the said contract with the Housing Authority of the Seminole Nation of Oklahoma, are sufficient to cause the said deed dated February 20, 1970, from said Grantors to said Grantee to be in

---

[4] On March 16, 1970, Storts filed a written acknowledgment of notice of the pendency of the proceeding filed by Kizzie and her husband. State Tr. of Hearing Exhibits (Dec. 13, 2007), Exh. 14, at 12. In that same written acknowledgment, the Area Director of the BIA, successor to the Superintendent of the Five Civilized Tribes, also acknowledged receipt of notice of the pendency of the sale of the Tract. Id.

[5] It appears the order was drafted by Kizzie's attorney and signed by the state district judge.

the best interest of these Petitioners and that said deeds should be ratified, confirmed and approved in the name of the said Grantee, the Housing Authority of the Seminole Nation of Oklahoma, without submitting the same at public auction.

The Court further finds that M. Dean Storts, United States Trial Attorney, has joined with the said Petitioners and requested the Court to approve said deed without submitting the same at public auction and has agreed that said conveyance would be in the best interest of said Petitioners.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED, by the Court, that said above described deed dated February 20, 1970, executed by the Petitioners herein, conveying all of their right, title and interest in and to the above described land to the Housing Authority of the Seminole Nation of Oklahoma, be and the same is hereby ratified, confirmed and approved and for the purpose of identification the Court has endorsed upon the said deed the following, to-wit:

> "Examined and approved in open Court this 16th day of April, 1970.
>
> Frank H. Seay
> Judge of the District Court"

and the said Petitioners and Grantors are hereby directed to deliver said deed to said Grantee as a valid approved deed by this Court conveying said above described land.

Id at 3-4.

The Housing Authority proceeded to build a house on the Tract (the house where the crimes at issue in this case occurred). And, in turn, Kizzie and her husband apparently made the requisite payments to the Housing Authority. In 1981, the Housing Authority executed a quit claim deed conveying its interest in the Tract back to Kizzie and her husband. Tr. of Evid. Hr'g at 50 (testimony of

15

Allen Woodcock).

Kizzie died on September 23, 1991. Kizzie's husband received a ½ interest in the Tract. Kizzie's nine children each received a 1/18th interest in the Tract. At the time of Magnan's crimes, the Tract remained in the possession of Kizzie's heirs and their successors.

*b) The definition of "Indian country*"

The term "Indian country," for purposes of criminal jurisdiction, is defined in 18 U.S.C. § 1151. See DeCoteau v. Dist. Cnty. Court for Tenth Judicial Dist., 420 U.S. 425, 427 n.2 (1975) ("While § 1151 is concerned, on its face, only with criminal jurisdiction, the Court has recognized that it generally applies as well to questions of civil jurisdiction."). Section 1151 provides, in relevant part, that "the term 'Indian country' . . . means . . . (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same." 18 U.S.C. § 1151(c). Section "1151(c) contemplates that isolated tracts of 'Indian country' may be scattered checkerboard fashion over a territory otherwise under state jurisdiction." DeCoteau, 420 U.S. at 429 n.3.

The Supreme Court has held, citing to this definition of "Indian country," that "Federal and tribal courts have exclusive jurisdiction over those portions of the opened [Indian reservation] lands that were and have remained Indian allotments." Solem v. Bartlett, 465 U.S. 463, 467 n.8 (1984). The Court has also held that "federal jurisdiction over the offenses covered by the Indian Major

16

Crimes Act[, which include murder and assault with intent to commit murder,] is 'exclusive' of state jurisdiction." Negonsott v. Samuels, 507 U.S. 99, 103 (1993).

  *c) Congress's treatment of Indian allotments*

A series of federal statutes pertaining to Indian allotments bears on the status of the Tract at the time of the crimes at issue. To begin with, "the General Allotment Act [of 1887] provided for the division of tribal land into fee simple parcels owned by individual tribal members." Plains Commerce Bank v. Long Family Land and Cattle Co., 554 U.S. 316, 331 (2008). Specifically, the General Allotment Act provided that each allotted parcel would be held in trust by the United States for a "period of twenty-five years . . . for the sole use and benefit of the Indian to whom such allotment" was made. 25 U.S.C. § 348. The General Allotment Act further provided that, at the end of that twenty-five year period, the United States would "convey the same by patent to said Indian . . . in fee, discharged of said trust and free of all charge or incumbrance whatsoever." Id.

The 1908 Allotment Act, 35 Stat. 312, "released particular Indian owners from the[] restrictions [imposed by the General Allotment Act] ahead of schedule, vesting in them full fee ownership." Plains Commerce, 554 U.S. at 331. But it also provided, in relevant part, that parcels of land allotted to tribal members with at least 3/4 Indian blood could not be alienated until April 26, 1931, unless the restrictions were removed by the Secretary of the Interior. See Act of May 27, 1908, ch. 199, § 1, 35 Stat. 312. In 1928, Congress extended for an additional

17

twenty-five years, or until April 26, 1956, the restrictions on alienation imposed

by the 1908 Act.  See Act of May 10, 1928, ch. 517, § 1, 45 Stat. 495.

On July 2, 1945, Congress passed a law (the 1945 Act) providing, in

pertinent part:

> That no conveyance made by an Indian of the Five Civilized Tribes
> on or after April 26, 1931, and prior to the date of enactment of this
> Act, of lands purchased, prior to April 26, 1931, for the use and
> benefit of such Indian with funds derived from the sale of, or as
> income from, restricted allotted lands and conveyed to him by deed
> containing restrictions on alienation without the consent and approval
> of the Secretary of the Interior prior to April 26, 1931, shall be
> invalid because such conveyance was made without the consent and
> approval of the Secretary of the Interior: *Provided*, That all such
> conveyances made after the date of the enactment of this Act must
> have the approval of the Secretary of the Interior.

Act of July 2, 1945, ch. 223, § 1, 59 Stat. 313, 313-14 (emphasis in original).  As

the testimony presented at Magnan's state evidentiary hearing made clear, the

1945 Act was intended by Congress to "cure" all of the conveyances of purchased

interests that had occurred prior to that time and that may not have otherwise

complied with the requirements of prior acts.  But the 1945 Act also made plain

that, subsequent to its enactment, any conveyances of purchased interests had to

have the approval of the Secretary of the Interior.

On August 4, 1947, Congress passed a law (the 1947 Act) addressing, in

pertinent part, conveyances of inherited interests in allotments:

> That all restrictions upon all lands in Oklahoma belonging to
> members of the Five Civilized Tribes, whether acquired by allotment,
> inheritance, devise, gift, exchange, partition, or by purchase with

18

restricted funds, of whatever degree of Indian blood, and whether enrolled or unenrolled, shall be, and are hereby, removed at and upon his or her death: *Provided*, (a) That except as provided in subsection (f) of this section [regarding the sales of the interests of minor and incompetent persons], no conveyance . . . of any interest in land acquired before or after the date of this Act by an Indian heir or devisee of one-half or more Indian blood, when such interest in land was restricted in the hands of the person from whom such Indian heir or devisee acquired same, shall be valid unless approved in open court by the county court of the county in Oklahoma in which the land is situated.

Act of Aug. 4, 1947, ch. 458, § 1, 61 Stat. 731 (emphasis in original).

Lastly, the Act of August 11, 1955 (Act of 1955) extended, "for the lives of the Indians who own such lands subject to such restrictions on the date of this Act," the restrictions on alienation originally imposed by the 1908 Act. See Act of Aug. 11, 1955, ch. 786, § 1, 69 Stat. 666, 667. The Act of 1955 also provided that "[a]ny Indian of the Five Civilized Tribes may apply to the Secretary of the Interior for an order removing restrictions," and it outlined procedures for doing so. Id. § 2. In particular, the Act of 1955 contemplated that an Indian would file an "application" with the Secretary, and that the Secretary would "either issue the order or disapprove the application" within ninety days. Id., § 2(a). The 1955 Act set forth a specific standard for the Secretary to apply in ruling on such an application:

The order shall be issued if in the judgment of the Secretary the applicant has sufficient ability, knowledge, experience, and judgment to enable him, or her, to manage his, or her, business affairs, including the administration, use, investment, and disposition of any property turned over to such person and the income or proceeds

19

therefrom, with such reasonable degree of prudence and wisdom as will be apt to prevent him, or her, from losing such property or the benefits thereof.

Id.

*d) The OCCA's analysis of the jurisdictional issue*

In addressing the jurisdictional issue raised by Magnan on direct review, the OCCA began its analysis by stating that the 1945 and 1947 Acts, "[w]hen read together, . . . appear to require that for the 1970 deed [from Kizzie to the Housing Authority] to have removed restrictions on the property, two conditions must have been met." Magnan I, 207 P.3d at 403. "First," the OCCA stated, "the 1945 Act seems to require that the Secretary of the Interior have consented to the conveyance of that portion of the surface property Kizzie Tiger Wolf had acquired by inheritance (1/5th interest) from her father." Id. "Second," the OCCA stated, "the 1947 Act seems to require that the conveyance must have been approved in open court by the Oklahoma state court of the county in which the property was located for that portion of the property Kizzie Tiger had acquired by conveyance from her siblings."[6] Id. at 403-404.

---

[6] The OCCA clearly conflated the requirements of the 1945 and 1947 Acts. As a result of this conflation, the OCCA presumably began its analysis of the jurisdictional issue under the mistaken assumption that Kizzie needed the Secretary of the Interior's approval to convey only 1/5th of the Tract when, in fact, Kizzie needed the Secretary's approval to convey 4/5ths of the Tract.

As we note below, however, the OCCA ultimately recognized, at the end of its discussion, that the 1945 Act applied to purchased interests and that the 1947 Act applied to inherited interests. Consequently, it is unclear whether the

(continued...)

In turn, the OCCA concluded that "[t]he record of the 1970 Seminole County District Court proceeding in which Kizzie Tiger Wolf sought approval of the conveyance of the surface rights from her and her husband to the Seminole County Housing Authority shows that the requirements of both Acts were met during the course of the proceeding." Id. at 404. In support, the OCCA stated:

> The record shows that in 1970, Kizzie Tiger Wolf and her husband petitioned the Seminole County District Court for removal of restrictions and approval of the deed purporting to convey their entire interest in the surface rights in the property to the Seminole Nation Housing Authority. Notice of that proceeding was served on the Area Director of the Bureau of Indian Affairs and the United States Department of the Interior. Dean Storts, "Trial Attorney, United States Department of the Interior" acknowledged receipt on behalf of the Department of the Interior. Kizzie Tiger Wolf appeared at the hearing with her attorney, James Groves, and offered testimony. Mr. Storts appeared at the hearing for the Department of the Interior and entered no objection to the conveyance.
>
> * * * *
>
> In the evidentiary hearing held on our remand in this case, the district court concluded that the 1970 conveyance removed all restrictions on the surface estate. It did so by reasoning that the 1970 deed purported to convey ***all*** of Kizzie Tiger Wolf's surface rights to the Seminole Nation Housing Authority (including her 4/5ths interest requiring Secretary of the Interior approval under the 1945 Act), and that the participation of the Department of the Interior's attorney in that proceeding, a proceeding in which he requested that the deed be approved by the Seminole County District Court, constituted the requisite approval of the Secretary of the Interior necessary for the lifting of restrictions on the 4/5ths surface interests Kizzie Tiger

---

[6](...continued)
OCCA's initial conflation of the requirements had any impact on its ultimate conclusion.

21

Wolf obtained by purchase from her siblings. With regard to Kizzie Tiger Wolf's 1/5th inherited interest, the district court seemed to conclude that no Secretarial approval was required under the 1945 Act, but that state court approval was required under the 1947 Act, and that approval was granted, as permitted by the Act, with entry of the Seminole County District Court's Order approving the conveyance.

It is clear from this record, that regardless of whether the 1970 proceeding in Seminole County District Court was intended to do so or not, it was in effect a combined proceeding that satisfied the requirements of both the 1945 and 1947 Acts (i.e., the 1945 Act requiring secretarial approval for conveyance of property acquired by deed, and the 1947 Act requiring Oklahoma State court approval for property acquired by inheritance). We agree with the district court's conclusion, therefore, that the 1970 conveyance extinguished all Indian lands restrictions that attached to surface estate of the property.

Id. (internal paragraph numbers omitted).

The OCCA also rejected Magnan's argument that the Tract remained Indian land because of the character of the mineral interest:

Magnan argues that even if Indian land restrictions to the surface were removed in their entirety by the 1970 conveyance, 4/5ths of the mineral interests remain restricted and by virtue of that remaining restricted fractional interest, the entire property (surface and mineral) retained its character as Indian allotment land. The 4/5ths figure Magnan relies on appears to be based on a title opinion contained in the supplemented record, an opinion which the district court found to be "a correct statement of the ownership interests of the title to this property." While we defer to the district court's finding that the title opinion correctly describes the allocation of ownership interests in the property, we assume only for the sake of argument the legal conclusion that the 4/5ths mineral interest remained restricted as Indian allotment property.FN1 Assuming, therefore, that 4/5ths of the mineral interests in the property remained restricted, we are confronted with the second potentially dispositive jurisdictional question in this case: i.e., whether a fractional interest in the mineral

22

estate that is subject to restrictions on alienation as Indian allotment property may burden the unrestricted surface estate in such a way to cause the surface estate to be categorized as Indian Country.

> FN1. On the record before us, it is not clear how the title expert arrived at this figure and we are not necessarily convinced that it is correct based on the chain of title evidence contained in the record. In any event, Magnan's attorneys appear to concede that Kizzie Tiger Wolf's 1/5th inherited interest in the mineral estate was exempt from Indian land restrictions, and as stated in the main text, we need not resolve this issue, because the quantum of the fractional interest is not dispositive in this case.

This Court considered a similar question in Murphy v. State, 2005 OK CR 25, 124 P.3d 1198. In Murphy, a murder occurred on a state road that at one time had been Indian allotted land. Over time, the surface estate on which the road was located, and 11/12ths of the mineral estate, had been conveyed to non-Indians. Applying a contacts and interests analysis analogous to the familiar "minimum contacts" test set out in International Shoe Co. v. State of Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), the Murphy court concluded that the Oklahoma's [sic] contacts and interests in the surface property overwhelmed any fractional interest the Indian heir of the original allottee owned in the unseen mineral estate. According to Murphy, that conclusion was necessary because allowing an unobservable fractional interest to control the enforcement of laws on the surface of a property would lead to a checkerboard of alternating jurisdictions that would seriously burden the administration of state and local governments. Murphy, ¶¶ 42–43, 1206. Murphy held, therefore, that a fractional interest in an unobservable mineral interest is a contact with the surface estate that is insufficient to deprive the State of Oklahoma of criminal jurisdiction. Id. ¶ 42, 1206.

In this instance, although the restricted fractional interest is larger (4/5ths vs. 1/12th), under Murphy's contacts and interests rationale even a 4/5ths fractional interest in the mineral estate is insufficient to deprive the State of criminal jurisdiction over the surface of the property at issue here. This result stems in large part from the

23

unique circumstances of this particular property. Specifically, evidence introduced at the evidentiary hearing shows that another homicide had previously occurred on the property in 1998. In that case, United States v. Woods, No. CR–98–26–B (E.D.Okla.), federal authorities prosecuted the case as having occurred in Indian Country.FN2 Unlike Magnan, however, the defendant in Woods argued in federal district court that the property was *not* Indian Country. The federal district court agreed and dismissed the case for lack of jurisdiction. Key to the federal court's determination that the property was not Indian Country was its finding that Indian land restrictions on the property had been extinguished by Kizzie Tiger Wolf's 1970 conveyance of the surface rights to a non-Indian (i.e., the Seminole Nation Housing Authority).

> FN2. At the evidentiary hearing held on our remand, the district court admitted as evidence the record of certain portions of the proceedings of the United States District Court of the Eastern District of Oklahoma in the case of United States v. Woods, No. CR–98–26–B. The transcript of the federal court's jurisdictional hearings and its minute order dismissing the case for lack of jurisdiction are therefore before us as part of the record on appeal. We rely on those documents for our understanding of the federal district court's jurisdictional finding with regard to this property.

In the Woods case, the federal district court found that the Secretary of the Interior approved the lifting of restrictions on the property through the participation of the Department of the Interior's attorney in the 1970 Seminole County District Court proceeding where the Department's attorney not only failed to lodge any objection to the conveyance, but urged the court to approve it. Thus, with the ruling of the federal district court in Woods that the property at issue here was not Indian Country, the United States ceded criminal jurisdiction over the property. Because the United States District Court for the Eastern District of Oklahoma found this same property not to be Indian Country for federal criminal jurisdictional purposes, unless we likewise find the property to be non-Indian Country, no sovereign entity will exercise criminal jurisdiction over the property, thereby creating a jurisdictional void.

24

If Oklahoma has a sufficient interest to exert criminal jurisdiction over the surface of a property restricted by an unobserved fractional mineral interest in order to avoid creation of a checkerboard jurisdiction, it must have an even more compelling interest in avoiding the creation of a jurisdictional void within its contiguous territory. Therefore, as in Murphy, but to an even greater degree here, the State's interest in exercising criminal jurisdiction over this property must overwhelm any fractional interest any Indian heirs of the original allottee may own in the unseen mineral estate. We agree, therefore, with the district court's conclusion that the crimes committed in this case did not occur in Indian Country and we likewise conclude that criminal jurisdiction was proper.

Id. at 404-406 (internal paragraph numbers omitted).

*e) Magnan's challenges to the OCCA's ruling*

Magnan argues that, contrary to the conclusion reached by the OCCA, "the 1970 conveyance to the Housing Authority was invalid, and thus 'null and void, 35 Stat 312, § 5, because Kizzie . . . never obtained approval of the Secretary of [the] Interior, as federal law required her to do, to remove the alienability restrictions on her purchased Indian allotment." Aplt. Br. at 14. In support, Magnan asserts that "[t]he 1970 court proceeding . . . was structured to satisfy the separate statutory requirement for *inherited property* only; it made no reference to the statutes governing conveyance of *purchased property*, in particular the Secretarial-approval requirement." Id. Thus, Magnan asserts, although Kizzie's "1/5 ownership interest received by inheritance was governed by the 1947 Act," and "the state court's approval of the 1970 conveyance met the requirements of the 1947 Act and validly authorized the transfer of [that] 1/5 *inheritance* interest

in the property," "[t]he same is not true . . . for her 4/5 *purchased* interest, which is governed by other laws." Aplt. Br. at 26.

It is indisputable that the 1945 Act governed the conveyances of Kizzie's purchased interests in the Tract and required Kizzie and her husband to obtain the approval of the Secretary of the Interior before she could convey those purchased interests to the Housing Authority.[7] Indeed, the respondent concedes this point, and the OCCA itself recognized that federal law required the Secretary's approval of the conveyance of Kizzie's purchased interests in the Tract. We thus turn our attention to the OCCA's conclusion that the 1970 state court proceeding effectively satisfied this Secretarial-approval requirement.

Employing the AEDPA standards of review, we first address whether the OCCA's conclusion "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Magnan argues that the OCCA's conclusion was, indeed, contrary to the principles announced in Tiger v. Western

___

[7] To be sure, Magnan suggests in passing that the 1955 Act, "[a]s the most recent law on the books in 1970," may have governed the purported conveyance of Kizzie's 4/5 purchased interest in the Tract. Aplt. Br. at 27. We find no merit to that suggestion. The 1945 Act provides that any conveyances of restricted purchased lands must have the approval of the Secretary of the Interior. The 1955 Act, in contrast, permits an Indian holding any type of restricted land, whether inherited or purchased, to apply to the Secretary for removal of the restrictions, and such application is not dependent upon the existence of a planned or pending conveyance. Thus, the OCCA did not, as implied by Magnan, err by ignoring the 1955 Act.

26

Investment Co., 221 U.S. 286 (1911).  At issue in Tiger was "the validity of conveyances [of land] made by Marchie Tiger, . . . a full-blood Indian of the Creek tribe, to" an investment company and related individuals.  Id. at 298.  The lands at issue "were located in the Indian territory, were allotted under certain acts of Congress, . . . and were inherited by Marchie Tiger during the year 1903 from his [siblings], [all of whom were] members of the Creek nation, and allottees of the lands which were passed by inheritance to Marchie Tiger."  Id.  In the summer of 1907, Marchie "sold and conveyed by warranty deed to the [defendants] certain of the said lands" for cash payments.  Id.  "[A]ll of these conveyances were made without the approval of the Secretary of the Interior."  Id. at 299.  Marchie subsequently "offered to return the amounts paid by the respective purchasers," but those offers were refused.  Id.  Marchie then filed suit in Oklahoma state court "to have the deeds in question canceled, and the claim set aside as a cloud upon [his] title."  Id.  "The supreme court of Oklahoma held the conveyances valid and denied relief to [Marchie]."  Id.

The United States Supreme Court granted Marchie's petition in error in order to address the question of whether "a full-blood Creek Indian, on and after the 8th day of August, 1907, [could] convey the lands inherited by him from his relatives, who were full-blood Creek Indians, which lands had been allotted to them, so as to give a good title to the purchaser, although the conveyance was made without the approval of the Secretary of the Interior[.]"  Id.  And the Court

27

ultimately concluded that, under the provisions of the Act of April 26, 1906, ch. 1876, 34 Stat. 145, Congress created "a comprehensive system of protection as to" allotted lands held by Indians of the Five Civilized Tribes, that included a requirement that conveyances of those lands had "to be approved by the Secretary of the Interior." Id. at 306. In other words, the Court held "that the act of April, 1906, while it permitted inherited lands to be conveyed by full-blood Indians, nevertheless intended to prevent improvident sales by this class of Indians, and made such conveyance valid only when approved by the Secretary of the Interior." Id. at 309-310. And, because the conveyances at issue in the case before it had not been approved by the Secretary of the Interior, the Supreme Court reversed the judgment of the Oklahoma Supreme Court holding the conveyances to be valid. Id. at 317.

Nearly 100 years later, in United States v. Navajo Nation, 537 U.S. 488 (2003), the Supreme Court noted, with a citation to and brief discussion of Tiger, that "[t]he protective purpose of the Secretary's approval power has appeared in our discussion of . . . statutes governing Indian lands over the years." 537 U.S. at 515. In Tiger, the Court noted, it recognized "that the requirement of prior approval [by the Secretary] was supposed to satisfy the National Government's trust responsibility to the Indians." Id. Indeed, the Court noted, "[t]he Secretary's approval power," which was intended to protect Indians against those who would attempt to obtain their property for inadequate compensation, "was

28

understood to be a significant component of the Government's general trust responsibility." Id. at 516.

Magnan does not explain how the OCCA's analysis in his case is contrary to, or an unreasonable application of, the holdings in Tiger or Navajo Nation. As we read Magnan I, the OCCA recognized that, pursuant to federal statute, the Secretary's approval was a prerequisite to the conveyance of restricted purchased lands. That recognition, in our view, is consistent with the general principles outlined in Tiger and Navajo Nation, i.e., that Secretarial approval of conveyances is part of the federal government's general trust responsibility to the Indians of the Five Civilized Tribes. To the extent the OCCA went on to conclude that the unique characteristics of the 1970 court proceeding satisfied the Secretarial approval requirement, that conclusion is neither contrary to, nor an unreasonable application of, Tiger or Navajo Nation for the simple reason that neither of those cases addressed how Secretarial approval is to be obtained.

We next address whether the OCCA's conclusion "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). As we proceed to explain, the OCCA made two unreasonable determinations of fact, at least one of which clearly impacted its conclusion.

In assessing whether the requirements of the 1945 and 1947 Acts had been met, the OCCA stated: "The record shows that in 1970, Kizzie . . . and her

29

husband petitioned the Seminole County District Court for <u>removal of restrictions</u> and approval of the deed purporting to convey their entire interest in the surface rights in the [Tract] to the . . . Housing Authority." <u>Magnan I</u>, 207 P.3d at 404 (emphasis added). According to the state evidentiary record, however, Kizzie and her husband initiated the 1970 state court action by filing what was styled as a "PETITION FOR APPROVAL OF WARRANTY DEED." State Tr. of Hearing Exhibits (Dec. 13, 2007), Exh. 14 at 5. Nowhere in its body did this petition use the phrase "removal of restrictions," nor did it ask the state district court to remove all restrictions from the Tract. Instead, the petition asked the state district court only to waive competitive bidding and approve the warranty deed; steps that would have been consistent with attempting to satisfy the requirements of the 1947 Act with respect to restricted inherited interests. Thus, the OCCA's finding that Kizzie and her husband filed a petition for removal of restrictions in the 1970 state court proceeding was an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

To be sure, it is unclear precisely what impact this unreasonable determination of facts had on the OCCA's ultimate determination that the 1970 state court proceeding satisfied the requirements imposed by federal law for removing the restrictions on the Kizzie's purchased interests in the surface of the Tract. That is because the OCCA stated: "It is clear from this record, that regardless of whether the 1970 proceeding in Seminole County District Court was

30

intended to do so or not, it was in effect a combined proceeding that satisfied the requirements of both the 1945 and 1947 Acts (i.e., the 1945 Act requiring secretarial approval for conveyance of property acquired by deed, and the 1947 Act requiring Oklahoma State court approval for property acquired by inheritance)." Magnan I, 207 P.3d at 404. In other words, the OCCA appears to have concluded that, regardless of whether or not Kizzie and her husband intended for the 1970 court proceeding to operate as a vehicle for meeting the Secretarial approval requirement of the 1945 Act, the appearance of attorney Dean Storts at that proceeding, and his failure to voice any objections to the conveyance, operated as Secretarial approval for purposes of the 1945 Act.

That conclusion, however, necessarily had to rest on a finding that Storts possessed authority to act on the Secretary's behalf, for purposes of the 1945 Act, in approving the conveyance of Kizzie's purchased interests in the Tract. But that finding amounts to an unreasonable determination of the facts, for purposes of § 2254(d)(2), in light of the evidence presented at the state evidentiary hearing regarding the jurisdictional issue. During that hearing, copies of the pleadings filed in the 1970 court proceeding were introduced into evidence. Included among those pleadings was an "Acknowledgment of Notice" filed jointly by Storts and Virgil Harrington, the Area Director of the BIA. In that pleading, Storts stated that he was appearing as "Trial Attorney, United States Department of the Interior, successor to the United States Probate Attorney," and expressly

31

acknowledged "receipt of written notice of the pendency of this proceeding this 16th day of March, 1970, said notice being jurisdictional, under the Act of Congress of August 4, 1947, ch. 458, 61 Stat. 731." State Tr. of Hearing Exhibits (Dec. 13, 2007), Exh. 14 at 12. In that same pleading, Harrington also acknowledged receipt of the pendency of the sale, with "said notice being given under Section 10 of the Act of Congress of August 4, 1947, ch. 458, 61 Stat. 731, with respect to the Preferential Right of Purchase given the Secretary of the Interior under Section 2 of the Act of Congress of June 26, 1936, ch. 831, 49 Stat. 1967." Id. Importantly, these statutory references were to the 1947 Act, which, as we have established, governs conveyances of restricted inherited lands. Notably, no references were made by either Storts or Harrington to the 1945 Act, which governed the conveyance of Kizzie's restricted purchased interests in the Tract.

And, significantly, the only testimony presented at the state evidentiary hearing regarding Storts' authority was directly contrary to the OCCA's finding that Storts had authority to act on behalf of the Secretary of the Interior for purposes of approving the conveyance of Kizzie's purchased restricted interest under the 1945 Act. At the state evidentiary hearing, Monta Sharon Blackwell was recognized by the court as an expert in Indian law, particularly with regard to Five Civilized Tribe restricted Indian allotments. Blackwell testified that she was employed by the Department of Interior for more than twenty-five years, and in

32

2000 was appointed as the Deputy Commissioner of Indian Affairs. Blackwell testified that staff attorneys from the Field Solicitors Office, such as Storts, appeared in state district courts pursuant to the specific authority granted in Section 1 of the 1947 Act regarding inherited restricted property, and that, in turn, their responsibility in such cases was limited to representing the restricted inherited interest. Relatedly, Blackwell testified that Storts, in entering an appearance in the 1970 state court proceeding, could not have been responsible for determining, on behalf of the Secretary of the Interior, whether the restrictions on Kizzie's purchased interests in the Tract should be, or had been, properly removed. Instead, she testified, it would have been the responsibility of the purchaser of the Tract, i.e., the Housing Authority, to make sure that Secretarial approval for the conveyance of Kizzie's purchased interests was obtained.

*f) De novo review of the jurisdictional issue*

Because the OCCA's resolution of the jurisdictional issue "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), we are obligated to review the jurisdictional issue de novo, see Fairchild v. Workman, 579 F.3d 1134, 1158-1159 (10th Cir. 2009); Wilson v. Workman, 577 F.3d 1284, 1303 (10th Cir. 2009); Brown v. Uphoff, 381 F.3d 1219, 1225 (10th Cir. 2004).

As we have previously noted, it is undisputed that the 1945 Act required Secretarial approval of the conveyance of Kizzie's purchased interests in the

33

Tract. The 1945 Act does not, however, describe what procedures Kizzie or the Housing Authority should have taken to obtain such approval. Although respondent continues to suggest that the 1970 state court proceeding could reasonably operate to satisfy the Secretarial approval requirement, we have already explained why there is no basis in the record to support a finding that Storts possessed authority to act on the Secretary's behalf for purposes of satisfying the requirements of the 1945 Act. And, more importantly, nothing in the language of the 1945 Act persuades us that the Secretarial approval requirement was reasonably intended to be satisfied by way of a state court proceeding.

Any doubts on this score, we believe, are removed by examining the relevant federal regulations in place at the time of the 1970 state court proceeding. At that time, there was a federal regulation in place, 25 C.F.R. § 121.34, that mandated the submission of a specific application form in order to obtain Secretarial approval for sales of restricted lands. Section 121.34, entitled "Removal of restrictions, application," provided as follows:

> Application for the removal of restrictions and for approval of sales of lands must be made in triplicate on approved form Five Civilized Tribes, 5-484, and submitted to the superintendent for the Five Civilized Tribes or any field clerk. These forms will be furnished free of charge by the superintendent or field clerk.

25 C.F.R. § 121.34 (1970). Although this regulation did not expressly reference the 1945 Act, it clearly appears to have been intended to encompass sales of

34

purchased interests in allotments. Notably, there is no suggestion by respondent, nor any evidence in the record indicating, that Kizzie or the Housing Authority complied with this regulation by filing an application for approval of the sale of the Tract to the Housing Authority.

For these reasons, we conclude that the Secretarial approval requirement of the 1945 Act was not met and that Kizzie's purchased interests in the Tract were never conveyed to the Housing Authority. In turn, we conclude that the Tract, at the time of Magnan's crimes, was "Indian country," and that exclusive jurisdiction over those crimes rests with the United States.[8] See United States v. Pelican, 232 U.S. 442, 447-449 (1914) (holding that, for purposes of criminal jurisdiction, trust allotments retain during the trust period a distinctively Indian character and thus constitute "Indian country"); id. at 449-451 (emphasizing that, for purposes of determining the status of land as "Indian country," there is no significant difference between a trust allotment and a restricted allotment); see also United States v. John, 437 U.S. 634, 654 (1978) (holding that Indian Major Crimes Act provided a proper basis for federal prosecution of a crime occurring on lands held in trust by the federal government for the benefit of the Mississippi

---

[8] Because we conclude that the Secretarial approval requirement of the 1945 Act was not satisfied and that the Tract thus retained its status as "Indian country" at the time of Magnan's crimes, we need not address the alternative arguments forwarded by Magnan or the arguments asserted by the Seminole Nation in its amicus brief.

Choctaw Indians).

                                         III

Because jurisdiction over Magnan's crimes rests exclusively with the United States, rather than the State of Oklahoma, Magnan is "in custody in violation of the . . . laws . . . of the United States."  28 U.S.C. § 2254(a); see generally O'Neal v. McAninch, 513 U.S. 432, 446 (1995) (holding that § 2254(a) "requires a causal link between the violation and the custody").  Consequently, we are obligated to grant federal habeas relief in favor of Magnan pursuant to § 2254.

The judgment of the district court is REVERSED and the case REMANDED to the district court with instructions to grant Magnan's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 and direct respondent to release Magnan from custody upon issuance of the mandate.[9]

---

[9] Given the nature of the crimes and Magnan's admitted guilt, we presume that federal authorities will arrest and try Magnan following his release from State custody.

36

11-7072 - *Magnan v. Workman*

**HARTZ**, Circuit Judge, concurring:

I join fully the opinion of Chief Judge Briscoe. I write separately only to explain why I think that there is substantial merit to Magnan's argument that we need not defer under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) to the Oklahoma court's jurisdictional ruling.

AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to *any claim that was adjudicated on the merits in State court* proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added). The question is whether a claim "was adjudicated on the merits in State court" if the state court had usurped (albeit in good faith) the exclusive jurisdiction of federal courts in prosecuting the case.

The language of § 2254(d) does not explicitly address the issue. Given the overall thrust of AEDPA to limit federal-court interference in state-court prosecutions, one could be tempted to construe the provision broadly as requiring deference in federal habeas proceedings to state-court rulings on jurisdiction. But there are fundamental background principles at play that counsel caution.

First, the trial court's jurisdiction has historically been the core consideration of habeas proceedings. It is apparently undisputed that in 1789 the common law granted courts the authority to provide habeas relief if the committing court lacked jurisdiction. *See INS v. St. Cyr*, 533 U.S. 289, 344 (2001) (Scalia, J., dissenting) ("'Once a person had been convicted by a superior court of general jurisdiction, a court disposing of a habeas corpus petition could not go behind the conviction for any purpose other than to verify the formal jurisdiction of the committing court.'" (quoting Oaks, *Legal History in the High Court—Habeas Corpus*, 64 Mich. L. Rev. 451, 453 (1966)) (brackets omitted)); *Wright v. West*, 505 U.S. 277, 285 (1992) (Thomas, J.). And in construing the Suspension Clause, U.S. Const. art. I, § 9, cl. 2 ("The privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."), the justices of the Supreme Court agree that "'at the absolute minimum,' [it] protects the writ 'as it existed in 1789.'" *Boumediene v. Bush*, 553 U.S. 723, 815 (2008) (Roberts, C.J., dissenting) (quoting *St. Cyr*, 533 U.S. at 301); *see id.* at 844 (Scalia, J., dissenting) ("The nature of the writ of habeas corpus that cannot be suspended must be defined by the common-law writ that was available at the time of the founding.").

Second, federal courts do not defer to a state court's determination of jurisdiction when the state assumed jurisdiction in violation of a grant of exclusive jurisdiction to the federal courts. *See Travelers Indem. v. Bailey*, 129 S.

Ct. 2195, 2206 n.6 (2009); *Kalb v. Feuerstein*, 308 U.S. 433, 438–39 (1940). Although the cited cases are civil disputes, not criminal prosecutions, res judicata principles are certainly no weaker in habeas proceedings, which, after all, are solely to set aside final judgments.

I do not suggest that these background considerations are dispositive. The Supreme Court has not resolved whether the Suspension Clause has any application to the States. And it may be enough that a state prisoner can seek review of a state court's jurisdictional ruling by petitioning for a writ of certiorari in the Supreme Court. But as a matter of statutory interpretation of § 2254(d), one may question whether Congress has required the federal courts to defer to a state-court ruling rejecting a claim that the federal courts were the exclusive jurisdiction for prosecuting criminal charges against the defendant. Certainly the comity considerations that animated AEDPA do not apply to prosecutions that usurped exclusive federal jurisdiction.